William Vernon MATTHEWS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2003–SC–00378–MR.

Supreme Court of Kentucky.

May 19, 2005.

**14**

Patrick Graney, Appeals Branch, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, John R. Tarter, Assistant Attorney General, Office of the Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

KELLER, Justice.

## I. INTRODUCTION

Appellant William Vernon Matthews was convicted of First–Degree Rape, found to be a Second–Degree Persistent Felony Offender ("PFO"), and sentenced to life in prison. He claims that the trial court abused its discretion when it (1) refused to grant a mistrial after a witness referred to his prior incarceration, (2) admitted evidence of a prior misdemeanor charge, and (3) admitted the victim's hospital records into evidence. We hold that the trial court did not commit reversible error in any of these instances, and we affirm the final judgment of the Rowan Circuit Court.

## II. BACKGROUND

Steve Anderson and his wife, Montana Anderson, were Appellant's neighbors. Mr. Anderson and Appellant were "drinking buddies." In August 2002, Appellant and Mr. Anderson got into an argument after which Mr. Anderson swore out a complaint against Appellant for terroristic threatening. Appellant was arrested, and though ultimately the charge was dismissed,[1] it was still pending in November 2002.

On November 14, 2002, Mr. Anderson became intoxicated, said he thought he was going into "DTs," and threatened to choke his wife. He called an ambulance and was taken to a hospital in Morehead, Kentucky, then to one in Chillicothe, Ohio. While in the hospital, Mr. Anderson called his wife and threatened to "whip" her. Two days later, Appellant drove Mrs. Anderson to the Kentucky State Police post in Morehead so that she could obtain an Emergency Protective Order (EPO) against Mr. Anderson. When Mrs. Anderson completed the paperwork, Appellant drove her home.

According to Mrs. Anderson's testimony, she was alone in her trailer later that night when Appellant entered without an invitation. Appellant was carrying a six-pack of beer. Mrs. Anderson repeatedly told Appellant to leave, but he refused. He drank beer and smoked marijuana. When Mrs. Anderson asked Appellant why he was there, Appellant told her that he was going to get revenge on her husband for putting him in jail. Mrs. Anderson went to the bathroom. When she came out of the bathroom, Appellant grabbed her by the arm and put a knife to her neck. Appellant then pulled her into the master bedroom and onto the bed. Mrs. Anderson claims that Appellant then raped her and threatened to kill her if she told anyone. She lost consciousness after the attack.

The next morning, Rowan County Sheriff's Deputy James Damron came to the Andersons' trailer. Mr. Anderson had asked him to retrieve some clothes and medicine that he could not retrieve himself because of the EPO. Unbeknownst to the Deputy, Mrs. Anderson placed a small notebook among Anderson's clothes. On the first page of the notebook, she had written: "Something bad happened Saturday night. Please try to help me when you can."

---

1. At least the terroristic threatening charge appears to have been dismissed. According to the court records relating to the charge, which were admitted in this rape trial, the district court held a bench trial on the terroristic threatening charge. The district court's handwritten order reads: "Bench Trial Verdict—The Court cannot reach a verdict due to the conflicting testimony; however the Court orders no contact between the parties."

Mr. Anderson received his wife's note on November 18, 2002, and he called her from a truck stop in Mt. Sterling, Kentucky. Mrs. Anderson begged him to come home, but she would not tell him why. He explained that he could not return home because of the EPO. Instead, Mrs. Anderson drove to Mt. Sterling to meet her husband. She explained to him that Appellant had raped her. Because Mr. Anderson feared he would be arrested for violating the EPO if he took his wife to a hospital in Kentucky, they traveled to West Virginia. Mr. Anderson took his wife to the Cabell–Huntington Hospital, which is located in Huntington, West Virginia. On the way to the hospital, they made a brief stop to call the Kentucky State Police to report the rape. At the hospital, a doctor examined Mrs. Anderson and administered a rape kit. Kentucky State Police Trooper Keith Carter later came to the hospital and took possession of the medical records containing the results from this kit.

Kentucky State Police Detective Anthony Anderson interviewed Mrs. Anderson two days later. She showed him a bruise on her arm, and a subsequent search of her trailer revealed "biological material" on the bed in the master bedroom. Detective Anderson then asked Mrs. Anderson to try to tape a telephone conversation with Appellant in order to obtain more evidence, but the attempt failed because Appellant was unwilling to discuss the matter on the phone. Appellant did ask the Andersons to meet with him face-to-face, and the two agreed. Mr. Anderson brought a hidden tape recorder to the meeting. During the course of the conversation, Appellant apologized, promised

never to hurt Mrs. Anderson again, and asked them not to involve the law. Mr. Anderson turned the tape over to Detective Anderson.

Appellant was indicted for First–Degree Rape and charged with being a Second–Degree PFO. At trial, the Commonwealth presented testimony as to the facts described above and also played the tape that Mr. Anderson made of his conversation with Appellant. And over Appellant's objection, the trial court allowed the Commonwealth to introduce Mrs. Anderson's medical records from the West Virginia hospital into evidence.

Appellant did not testify and presented only the testimony of Deputy Damron, who testified about traveling to the Andersons' trailer to get clothes and medication for Mr. Anderson after the EPO went into effect. Deputy Damron testified that Mrs. Anderson did not appear to be under any stress at the time. Appellant's attorney argued that Appellant and Mrs. Anderson had been having an affair, and that she had consented to intercourse with him on the night in question.[2]

The jury convicted Appellant of First–Degree Rape and found that he was a Second–Degree PFO. The trial court sentenced Appellant to a term of twelve years on the Rape charge and enhanced his sentence as a persistent felon to life in prison. Appellant now appeals to this court as a matter of right.[3]

## III. ANALYSIS

### A. Reference to Appellant's Prior Incarceration

Appellant's first allegation of error stems from a statement made during Mrs.

2. Appellant's brief cites to "evidence" of this in the record. Unfortunately, that evidence consists only of testimony given at a bond hearing prior to trial. Appellant did not testi-

fy at trial and thus the jury did not hear evidence of the alleged consensual affair.

3. Ky. Const. § 110(2)(b).

Anderson's testimony. On direct examination, the prosecutor asked Mrs. Anderson how long she and her husband had known Appellant. She responded: "When I moved here, we didn't know him. He hadn't been out of prison that long." Appellant's lawyer immediately objected and a bench conference ensued.

The trial court began the conference by acknowledging that the statement was inadmissible and asking Appellant's lawyer whether he wanted an admonition. Appellant's lawyer told the court that he wanted an admonition that would not identify the inadmissible portion of the statement. The trial court told him that it would be difficult to craft such an admonition because the rest of Mrs. Anderson's statement was admissible. Appellant's lawyer then requested a mistrial, but the trial court denied the motion and asked again whether Appellant wanted an admonition. Appellant's lawyer responded: "I don't think I want an admonition." The trial court then asked the prosecutor to instruct Mrs. Anderson not to say anything further about Appellant's prior incarceration. The prosecutor did so and the trial continued.

 Appellant now claims that the trial court abused its discretion in failing to grant his motion for a mistrial. Mrs. Anderson's statement was evidence that Appellant had previously been arrested for a crime different from the one for which he was standing trial. Evidence of other crimes is generally inadmissible,[4] though such evidence is admissible (1) if offered for a purpose other than proving a person's character in order to show action in conformity therewith, e.g., to prove motive, intent, opportunity, et cetera,[5] or (2) if the evidence is "so inextricably intertwined with other evidence essential to the case...."[6] Mrs. Anderson's statement was not offered pursuant to nor does it fall under either exception, and, as such, the statement was inadmissible.

 Although we find that Mrs. Anderson's statement was inadmissible, we disagree with Appellant's suggested conclusion and hold that the trial court did not abuse its discretion. We have long held that an admonition is usually sufficient to cure an erroneous admission of evidence,[7] and there is a presumption that the jury will heed such an admonition.[8] A trial court only declares a mistrial if a harmful event is of such magnitude that a litigant would be denied a fair and impartial trial and the prejudicial effect could be removed in no other way.[9] Stated differently, the court must find a manifest, urgent, or real necessity for a mistrial.[10] The trial court has broad discretion in determining when such a necessity exists because the trial judge is "best situated intelligently to make such a decision."[11] The trial court's decision to deny a motion for a mistrial should not be disturbed absent an abuse of discretion.[12]

4. KRE 404(b).

5. KRE 404(b)(1).

6. KRE 404(b)(2).

7. *Price v. Commonwealth,* 59 S.W.3d 878, 881 (Ky.2001); *Knuckles v. Commonwealth,* 261 S.W.2d 667, 671 (Ky.1953).

8. *Alexander v. Commonwealth,* 862 S.W.2d 856, 859 (Ky.1993).

9. *Maxie v. Commonwealth,* 82 S.W.3d 860, 862 (Ky.2002).

10. *Skaggs v. Commonwealth,* 694 S.W.2d 672, 678 (Ky.1985).

11. *Gosser v. Commonwealth,* 31 S.W.3d 897, 906 (Ky.2000).

12. *Neal v. Commonwealth,* 95 S.W.3d 843, 852 (Ky.2003).

First we note that Mrs. Anderson's statement was, in part, non-responsive to the prosecutor's question. We noted in *Phillips v. Commonwealth* [13] that "[w]here evidence of other crimes is introduced into evidence through the non-responsive answer of a witness, this court must look at all of the evidence and determine whether the defendant has been unduly prejudiced by that isolated statement." [14] In *Phillips*, a First-Degree Rape trial, the victim gave unsolicited testimony that informed the jury that Phillips had previously escaped from prison.[15] Phillips objected and moved for a mistrial, and although the trial court found the statement inadmissible, it refused to declare a mistrial.[16] On appeal, we affirmed the order of the trial court because we did not believe, "in view of all of the evidence presented by the Commonwealth, that Phillips was unduly prejudiced" by the victim's comment.[17]

The facts here are similar to those in *Phillips*. As in *Phillips*, Appellant appeals from the trial court's refusal to grant a mistrial on the grounds that evidence of a prior crime was introduced through the non-responsive answer of a witness for the prosecution. In both cases, the statement complained of came from the victim, and, in both cases, the victim supplied other crucial testimony without which a conviction would not have been possible, meaning that the jury was forced to determine whether it found the victim more credible than the defendant. But just as an isolated, non-responsive reference to prior crimes was insufficient to create a manifest

necessity for a mistrial in *Phillips*, the reference here was also insufficient.

We have also previously held in *Graves v. Commonwealth* [18] that an admonition to the jury cures an unsolicited reference to prior criminal acts. In *Graves*, a witness made a veiled reference to the appellant's prior criminal conviction by saying, "I knew he wasn't supposed to have a gun." [19] We noted that the reference was sufficiently oblique that its implications probably escaped the notice of the jury.[20] Nevertheless, we also held that even an unambiguous reference would not have necessitated a mistrial because "this type of evidentiary error is easily cured by an admonition to the jury to disregard the testimony," [21] but that the appellant "did not request an admonition." [22]

Similarly, the proper remedy in this case was an admonition. And indeed, the trial court offered to give an admonition, but Appellant refused the offer. The trial court was not required to give Appellant extraordinary relief simply because he refused the offer of another legally sufficient remedy. The trial court's refusal to grant a mistrial was not an abuse of discretion.

## B. Evidence of Misdemeanor Charge

Appellant also alleges that the trial court abused its discretion when it admitted other evidence of Appellant's prior crimes, namely evidence of the misdemeanor terroristic threatening charge that Mr. Anderson filed against Appellant. Ap-

13. *Phillips v. Commonwealth,* 679 S.W.2d 235, 237 (Ky.1984)

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. 17 S.W.3d 858, 865 (Ky.2000).

19. *Id.*

20. *Id.*

21. *Id.*

22. *Id.*

pellant now claims that this evidence was admitted in violation of KRE 404(b) and that the evidence was unnecessary, inflammatory, and prejudicial. More importantly, however, Appellant claims that the prosecution failed to give proper notice pursuant to KRE 404(c) that such evidence would be presented at trial. We disagree with both arguments, and we hold that the trial court did not abuse its discretion.

■ We turn first to the question of the admissibility of this evidence under KRE 404(b). In determining the admissibility of other crimes evidence, three inquires need to be separately addressed: (1) relevance, (2) probativeness, and (3) prejudice.[23] We will not disturb a trial court's decision to admit evidence absent an abuse of discretion,[24] and there was no such abuse here.

■ The evidence that Mr. Anderson had filed a criminal complaint against Appellant was introduced to prove that Appellant had a motive to commit the rape. So the evidence was relevant. The evidence had immense probative value because, if true, it showed that Appellant had a motive to rape Mrs. Anderson, and thus it tended to prove that he committed the crime. The risk of prejudice, however, was minimal because a reasonable jury would not conclude that anyone who has been arrested for a misdemeanor is inherently more likely to commit a rape. The probative value of this evidence, therefore, was not substantially outweighed by its potential for prejudice. Accordingly, we find that the evidence was admissible under KRE 404(b)(1).

■ Next, we turn to the question of whether the prosecutor provided adequate notice of its intent to introduce the evidence. KRE 404(c) requires the prosecutor to "give reasonable pretrial notice to the defendant of its intention to offer" evidence pursuant to KRE 404(b). If the prosecutor does not give such notice, "the court may exclude the evidence offered under subdivision (b) or for good cause shown may excuse the failure to give such notice and grant the defendant a continuance or such other remedy as is necessary to avoid unfair prejudice caused by such failure."

■ It is undisputed that the prosecutor did not give specific, written notice of his intention to use KRE 404(b) evidence. But where the accused has received "actual notice" of the intention to introduce KRE 404(b) evidence and the accused has suffered no prejudice, the notice requirement in KRE 404(c) is satisfied.[25] Whether reasonable pre-trial notice has been given is decided on a case-by-case basis[26] in light of the intent of the notice requirement in KRE 404(c), i.e., " 'to provide the accused with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with reliability and prejudice problems at trial.' "[27] This, in turn, requires us to examine the facts surrounding the admission of the evidence in question.

---

23. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky.1994) (citing ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.25(II) (3d ed.1993)).

24. *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky.1996).

25. *Walker v. Commonwealth*, 52 S.W.3d 533, 538 (Ky.2001); *Tamme v. Commonwealth*, 973 S.W.2d 13, 31 (Ky.1998); *Bowling v.*

*Commonwealth*, 942 S.W.2d 293, 300 (Ky. 1997).

26. *Walker*, 52 S.W.3d at 538.

27. *Bowling*, 942 S.W.2d at 300 (quoting ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.25 (3rd ed.1993)).

Before trial, the prosecutor gave Appellant discovery materials containing a statement from Mrs. Anderson indicating that Appellant had told her that he raped her to get revenge for the misdemeanor charge. The trial court heard similar evidence at Appellant's bond hearing, specifically testimony from Detective Anderson that Mrs. Anderson had told him that Appellant stated he was "going to get even" when he committed the rape. Immediately following this discussion, Detective Anderson noted that Mr. Anderson had filed the terroristic threatening charge against Appellant, with the clear implication that this charge was the reason that Appellant wanted to "get even."

At trial, the prosecutor first mentioned the same evidence during his opening statement. Appellant's lawyer immediately objected and claimed that the Commonwealth had failed to give adequate notice of its intent to introduce the evidence. The trial court overruled Appellant's objection, stating, "There was testimony about that at the bond hearing .... I think it all ties together." Counsel for Appellant objected again when the prosecutor sought to admit the audiotape in which Appellant himself mentioned the charge. The trial court also overruled this objection and admitted the tape. Finally, Appellant objected to the Commonwealth's introduction of the court records relating to the terroristic threatening charge. The trial court again overruled the objection, noting, "I think you were aware of it. In fact, DPA represented Mr. Matthews on this. And we heard testimony about it at the bond hearing. So I think it's admissible."

In *Tamme v. Commonwealth,*[28] *Walker v. Commonwealth,*[29] and *Bowling v. Commonwealth,*[30] the three cases where we have upheld the admission of KRE 404(b) evidence on "actual notice" grounds, the defendants actually raised the notice issue in motions *in limine.* The present case differs because Appellant's lawyer did not file a motion *in limine,* thus there is a question as to whether he had sufficient " 'opportunity to challenge the admissibility of this evidence through a motion *in limine.*' "[31] We find that in this case, Appellant also had actual notice and an opportunity to challenge the evidence through a motion *in limine.* Discovery materials provided by the Commonwealth contained a sworn statement from Mrs. Anderson indicating that Appellant told her that he raped her to get revenge on Mr. Anderson for filing charges. The prosecutor also produced testimony on this point along with testimony that the revenge was motivated by the charge at Appellant's bond hearing. Although this did not prompt Appellant's lawyer to file a motion *in limine* to suppress this evidence as occurred in our previous cases, the failure to file a motion in limine does not mean that Appellant did not receive actual notice that the evidence would be presented. To the contrary, we agree with the trial court that Appellant was given sufficient notice that the prosecutor's theory of the case was based on revenge by Appellant and that, as a result, evidence of Appellant's motive, namely the terroristic threatening charge, would be presented at trial so as to conform to the "reasonable notice" requirements of KRE 404(c). As such, the trial court did not abuse its dis-

---

**28.** 973 S.W.2d 13 (Ky.1998).

**29.** 52 S.W.3d 533 (Ky.2001).

**30.** 942 S.W.2d 293 (Ky.1997).

**31.** *Id.* (quoting ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.25 (3rd ed.1993)).

cretion in admitting the evidence of the terroristic threatening charge.

## C. Hospital Records

Appellant's final claim is that the trial court abused its discretion when it admitted into evidence a copy of hospital records relating to Mrs. Anderson's visit to the hospital in West Virginia. The records include a variety of information, including Mrs. Anderson's insurance information, her address, and the actual medical report. The report includes a transcription of notes dictated by the doctor during his examination of the victim. His notes list her general medical history, the results of a physical exam (i.e., her vital signs), and the following:

**CHIEF COMPLAINT:** Alleged rape.

**HISTORY OF PRESENT ILLNESS:** This pleasant and cooperative 39-year-old white female relates that this evening someone, whom she knows, watched her as she left the bathroom. When she got out of the bathroom, she states that he threw her down on the bed and held her down against her will. Whereupon doing this, again she was resisting the whole time, he took her clothes off and inserted his erected penis into her vagina. She states that she continued to put up a resistance all along throughout all of this occurrence.

She states that he did ejaculate inside her vagina.

She denies any penile oral or rectal intercourse. She states that "he grabbed my arms and bruised my arms" but otherwise she denies complaints.

. . . .

**EXTREMITIES:** Warm. Pulses are intact in all extremities. There is no obvious deformity. She does have minimal ecchymosis and tenderness just above the bilateral elbows.

**GENITALIA:** There is no obvious evidence of trauma to the external genitalia . . . . There are no mucosal tears, abrasions, or lesions present. No evidence of semen that is noted. Perianal area appears normal. No evidence of trauma.

**IMPRESSION:** Alleged rape.

**PLAN:** The Rape Kit was filled out and all of the evidence was collected and sealed appropriately . . . . The evidence was handed to the Kentucky State Patrolman present.

The medical report also includes some handwritten "Nursing Notes":

(2300) Pt. lying in bed. Stated she had been raped by known assailant on Sat. 11–16–02. Answered all questions appropriately . . . . Ky. State Police Officer K. Carter in attendance . . . . (2315) Started collecting evidence. Pt. Cooperative . . . . (0000) Moved pt. to 6B for exam & further evidence collection . . . . (0015) [illegible] Dr. Chapman for pelvic exam & specimen collected. Pt. [illegible] during exam . . . . (0030) Collection kit completed & given to Ky. St. Police Officer K. Carter.

The medical report also includes an "Alleged Sexual Assault History," which indicates that Mrs. Anderson said her assailant had used a knife and had restrained her with his hands by holding her down on her bed. The History also indicates that she had bruises above both elbows. The prosecutor moved to introduce these records at the end of his case in chief, but he had not presented the testimony of a witness to lay a foundation for the documents. Appellant's lawyer objected and argued that admission of the records without an accompanying witness would violate Appellant's right to confrontation. The trial court did not rule on the issue immediately, but at the end of all the proof, it overruled Appellant's objection and admit-

ted the evidence on the grounds that a foundation was unnecessary under KRS 422.300 because the records had been certified. Appellant now argues that the trial court abused its discretion in admitting the report because the prosecutor failed to call a foundation witness, meaning that introduction of this evidence violated the requirement of authentication.

Normally, the laying of a foundation or authentication is necessary for the admission of documentary evidence. KRE 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." But KRE 902 provides methods whereby documents may be self-authenticated, i.e., authenticated "without extrinsic evidence of authenticity."

▮▮▮▮ Appellant relies heavily on *Bell v. Commonwealth* for the contention that a medical report requires extrinsic evidence of authenticity in the form of an accompanying foundation witness and that KRS 422.300, which the trial court relied upon in this case, alone is not sufficient to allow the admission of hospital records. But Appellant overstates the holding of *Bell*. While we did note that KRS 422.300 " 'does not assure the[ ] admissibility [of medical records] or abrogate other rules of evidence relating to admissibility of documentary evidence,' " [32] and we held that a live witness would have been necessary to allow the admissibility of the medical records in that case, we did not hold that live foundation testimony is required in every instance where medical records are proffered as evidence. As Professor Lawson has noted, "the doctor [in *Bell*] appeared to have characteristics of both a nontreating physician ... and a treating physician," [33] but the KRE 803(4) hearsay exception, at that time, applied only to statements made for the purposes of treatment. Thus, Professor Lawson is correct when he further notes that we

> held [in *Bell*] that the ruling required by *Drumm [v. Commonwealth]* [34] ("whether prejudicial effect outweighs ... probative value") could not have been made without a determination of whether the physician was a treating or nontreating physician, that the record showed no determination of that crucial fact, and that admission of the written report without making that determination constituted reversible error.[35]

But there is no question in this case as to whether the physician was the treating physician—though, we note, this is not an issue under Kentucky law anymore [36]—or that some other hearsay exception applies (and this is likely the reason that Appellant has not raised the issue of whether KRE 803(4) or KRE 803(6) applies to the documents). The reading of *Bell* that Appellant urges upon us would effectively delete KRS 422.300 from the statute books. We decline Appellant's tacit invitation to do so. Thus we note that where KRS 422.300 is applicable and when a document in question meets the requirements of the statute, the document's au-

---

**32.** *Bell v. Commonwealth*, 875 S.W.2d 882, 887 (Ky.1994) (quoting *Young. v. J.B. Hunt Transp., Inc.*, 781 S.W.2d 503, 508 (Ky.1989)).

**33.** ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 8.55[3], at 856 (4th ed.2003).

**34.** 783 S.W.2d 380, 384–385 (Ky.1990).

**35.** LAWSON, *supra* note 33, § 8.55[3], at 856 (footnote added, omission in original).

**36.** *See Garrett v. Commonwealth*, 48 S.W.3d 6, 14 (Ky.2001) (overruling *Drumm* to the extent that it conflicts with the plain language of KRE 803(4)).

thenticity, at least insofar as KRE 901(a) requires proof that "the matter in question is what its proponent claims,"[37] is satisfied. But as we noted in *Young v. J.B. Hunt Transportation, Inc.*, the establishment of authenticity of a document does not necessarily mean that the document is admissible because there may be other barriers, e.g., hearsay, to its admission.

■ That said, we must note that KRS 422.300 is not applicable to the hospital records in this case. "Medical charts or records of any *hospital licensed under KRS 216B.105* that are susceptible to photostatic reproduction may be proved as to foundation, identity and authenticity without any preliminary testimony...."[38] KRS 216B.105 provides the authority for licensing of hospitals in the Commonwealth of Kentucky. But because the hospital records in question in this case are from a hospital in West Virginia, KRS 216B.105 does not apply to that hospital, and, by logical extension, KRS 422.300 does not apply to those records. KRS 422.300, therefore, cannot be used as a means of establishing the foundation, identity, or authenticity of records from hospitals from other states; the foundation, identity, and authenticity of those records must be proved by other means.

The records in this case are attached to a document that reads:

> This is to certify that the attached are true and accurate copies of the original patient records. These records were made in the course of business at the hospital, and have been kept in accordance with the hospital policy on record retention. I have caused these copies to be prepared and reviewed. As Medical Records Custodian, I am authorized to make this certification. The copies consist of 10 pages.

The document is signed by the Medical Records Custodian of the West Virginia hospital. The document also includes a short statement above the signature and seal of a notary public that reads: "Subscribed and sworn before me this 10[th] day of March, 2003." In effect, the document is an affidavit.

We have previously indicated that under KRE 902(8) the inclusion of a notarization with a document is sufficient to avoid the requirement of extrinsic evidence of authenticity.[39] This interpretation of the Rule would appear to be sufficient to allow the self-authentication of the medical records in this case. Such a blanket exception, however, is too far-reaching.

■ KRE 902(8) applies only to "[d]ocuments accompanied by a certificate of acknowledgement executed in the manner provided by law before a notary public." This rule replaced a statutory provision that read: "All instruments of writing required by law to be notarized, that are notarized, shall be received as evidence without any further authentication."[40]

---

37. KRE 901(a).

38. KRS 422.300 (emphasis added).

39. *See Young v. Commonwealth*, 968 S.W.2d 670, 674 (Ky.1998) ("[Appellant] does claim it was reversible error to permit the Commonwealth to introduce a record of the Colorado Department of Corrections containing Appellant's description, mug shot, and fingerprint card. This record contains the notarized certificate of an employee of 'Offender Records' that it is 'a full, true and correct copy of the original in my custody.' Appellant claims this certification is insufficient to permit self-authentication under KRE 902(2), (4), or (11). However, a notarized document needs no further authentication. KRE 902(8); KRS 422.100.").

40. KRS 422.100. This statute was repealed by Acts 1990, ch. 88, § 92, which became effective upon the enactment of the Kentucky Rules of Evidence on July 1, 1992.

Mere attachment of a notarized document to records, however, is not sufficient to allow the records to be introduced.

The certificate of acknowledgement contemplated by KRE 902(8) has been described as follows:

> The theory behind this form of authentication is simple. To have a document notarized, the person whose name is on the document must come before the notary and either be known to the notary or prove his or her identity. Additionally, the person either signs the document in the presence of the notary or swears the he or she did in fact execute the document, so it can be reasonably assumed that the document was executed by the person. The notary or other authorized officer preserves this chain of events in the certificate of acknowledgment, and the seal attached to the certificate attests that the certificate itself is authentic.[41]

The certificate of acknowledgement is evidence of the acknowledgement itself, which "in its technical legal sense is a formal declaration before a proper officer that an instrument is the act or deed of the person executing it,"[42] or, to put it more expressly, a "formal declaration[ ] of the genuineness of an instrument in writing made by a person executing it, [i.e., the instrument,] or the proof of due execution of such an instrument made by an attesting witness or other person, before a competent court or officer, in order to establish the validity of such instrument or entitle it to be admitted in evidence or be recorded."[43] The requirement of an acknowledgement is "wholly statutory."[44] In other words, "acknowledgment" is a term of art that describes the process used to prove the validity of the signatures on various documents so as to make those "instrument[s] admissible to record or in evidence."[45] Kentucky law uses the term "acknowledgement" in this sense.[46] As such, an acknowledgment is nothing more than "a verification that a document was executed ...."[47]

**41.** 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 902.10[1]. (Joseph M. McLaughlin, ed., Matthew Bender 2nd ed.2004).

**42.** 1A C.J.S. *Acknowledgements* § 2 (June 2004); *see also* 1 AM. JUR. 2D *Acknowledgements* § 1 (1994) ("Acknowledgement is a means of authenticating an instrument by showing that the instrument was the act of the person executing it.").

**43.** 1A C.J.S. *Acknowledgements* § 1 (June 2004) (emphasis added).

**44.** 1 AM. JUR. 2D *Acknowledgements* § 5 (1994).

**45.** 1A. C.J.S. *Acknowledgements* § 4 (June 2004).

**46.** *See* KRS 423.130. ("The person taking an acknowledgment shall certify that: (1) The person acknowledging appeared before him and acknowledged he executed the instrument; and (2) The person acknowledging was known to the person taking the acknowledgment or that the person taking the acknowledgment had satisfactory evidence that the person acknowledging was the person described in and who executed the instrument."); KRS 423.150 ("Certificate of acknowledgment. The words "acknowledged before me" mean: (1) That the person acknowledging appeared before the person taking the acknowledgment; (2) That he acknowledged he executed the instrument; (3) That, in the case of: (a) A natural person, he executed the instrument for the purposes therein stated; ... and (4) That the person taking the acknowledgment either knew or had satisfactory evidence that the person acknowledging was the person named in the instrument or certificate."); KRS 423.160 (setting forth "Statutory Short Forms of Acknowledgment."); KRS 423.190 (recognizing KRS 423.110 to 423.190 as the "Uniform Recognition of Acknowledgments Act").

**47.** *Hub City Wholesale Elec., Inc. v. Mik–Beth Elec. Co., Ltd.,* 621 S.W.2d 242, 243 (Ky.App. 1981).

Acknowledgments are used with a variety of documents, depending on statutory requirements, including "instruments affecting land, such as deeds, mortgages, leases, ... and powers of attorney ... [and] various other instruments ..., such as articles of incorporation, bonds, adoption papers, assignments of mortgages, or judgments."[48] The literature emphasizes that acknowledgements are used with "instruments" of various types. Kentucky law has traditionally understood an acknowledgement in this way.[49] And though Professors Underwood and Weissenberger are correct when they note that the acknowledgement exception in "KRE 902(8) is not limited to title documents, and it applies to any type of document which is properly acknowledged,"[50] that an acknowledgment is included with such documents as titles and deeds is telling as to the general use of acknowledgements and the applicability of the KRE 902(8) exception.

▆▆ The medical records in this case do not fall within the category of documents traditionally thought of as incorporating or depending upon an acknowledgement for self-authentication. And the document attached to the records does not purport to be or to contain a certificate of acknowledgement. Instead, the notary's short statement that the document was "[s]ubscribed and sworn before" her is at most a "jurat":

> A certification added to an affidavit or deposition stating when and before what authority the affidavit or deposition was made. A jurat typically says "subscribed and sworn before me this ___ day of [month], [year]," and the officer (usu. a notary public) thereby certifies three things: (1) that the person signing the document did so in the officer's presence, (2) that the signer appeared before the officer on the date indicated, and (3) that the officer administered an oath or affirmation to the signer, who swore to or affirmed the contents of the document.—Also termed *jurata*.[51]

A jurat, however, is different from an acknowledgement: "*Jurat distinguished.* A jurat is not the same as an acknowledgment, in that a jurat is a simple statement that an instrument is subscribed and sworn to or affirmed before a proper officer without the further statement that it is the act or deed of the person making it."[52] Essentially, an acknowledgement is used to verify a signature and to prove that an instrument was executed by the person signing it, whereas a jurat is evidence that a person has sworn as to the truth of the contents of the document. While both acknowledgments and jurats are usually notarized, they are not the same thing.[53] A

48. 1 AM. JUR. 2D *Acknowledgements* § 5 (1994) (footnotes omitted).

49. *See, e.g., Catron v. Jones*, 281 Ky. 163, 135 S.W.2d 419 (1939) (discussing an acknowledgement of a mortgage); *First Nat. Bank v. Varney*, 280 Ky. 78, 132 S.W.2d 529 (1939).

50. RICHARD H. UNDERWOOD & GLEN WEISSENBERGER, KENTUCKY EVIDENCE 2004 COURTROOM MANUAL 540 (Anderson Publishing Co. 2003); *see also* 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 902.10[1] (Joseph M. McLaughlin, ed., Matthew Bender 2nd ed. 2004) ("In virtu-

ally every state, acknowledged title documents are receivable in evidence without further proof. If this authentication suffices for documents affecting title, it is logical to approve this method when other kinds of documents are involved.").

51. BLACK'S LAW DICTIONARY 866 (8th ed.2004) (bracketed material in original).

52. 1A C.J.S. *Acknowledgements* § 2 (June 2004).

53. *See Hub City Wholesale Elec., Inc. v. Mik-Beth Elec. Co., Ltd.*, 621 S.W.2d 242, 243

such, KRE 908(2) cannot be used to authenticate the medical records.

We also note that even if we were to read the notarized document as an acknowledgement, and thus broaden KRE 902(8), the only effect would be to prove the signature of the records custodian who signed the certificate, which, in turn, would allow only for the self-authentication of the notarized document itself. Since "[a]n acknowledgment is a verification that a document was executed," [54] the medical records, which were filled out and compiled by persons other than the records custodian, would not fall with the purview of the custodian's document because those records were not "executed" by the addition of the custodian's signature. Ultimately, we would conclude that the collection of documents that were introduced consists of two separate documents—the medical records and an affidavit attached to those records—and that the medical records, though accompanied by an affidavit admissible under KRE 902(8), would have to be shown authentic under some rule other than KRE 902(8).

It is important to note that we have engaged in this analysis of KRE 902(8) only in part because we have ruled that KRS 422.300, on which the parties focused their discussion, was inapplicable in this case. It was necessary to address the parameters of the KRE 902(8) exception because the understanding of the exception implied in *Young v. Commonwealth* [55] threatens to swallow the self-authentication exception relating to business records

found in KRE 902(11). Medical records like those in this case generally fall under the business records hearsay exception embodied in KRE 803(6), [56] which usually requires a live witness foundation to be laid before the records will be admitted into evidence, but also provides that such records may be authenticated without extrinsic evidence if they meet one of several authentication exceptions, i.e., the exceptions provided in KRS 422.300, KRE 902(11), or other unspecified statutes. Normally, hospital records fall under the authentication exception because of KRS 422.300, but, as discussed above, the records in this case do not fall under the KRS 422.300 exception—nor do the records appear to fall under any other statutory exception.

This leaves only KRE 902(11) as the means for authenticating the medical records in this case without extrinsic evidence. Unless, of course, *Young v. Commonwealth* is correct in the broad assertion that KRE 902(8) means attaching a notarization to a document or records is sufficient for self-authentication. But as we have discussed above, this is an incorrect interpretation of KRE 902(8) because that Rule applies only to acknowledged documents. Also, if this broad understanding of *Young* is correct, then the KRE 902(11) requirements could be bypassed by simply attaching a notarization to business records as a means of self-authentication. KRE 902(11) would, in effect, be superfluous. Thus, we overrule *Young v. Commonwealth* to the extent

(Ky.App.1981) (refusing to recognize a lien where the document had been acknowledged, rather than sworn to, because "[a]n acknowledgment is a verification that a document was executed; however, when one subscribes and swears to a statement, one verifies the truth of its contents").

**54.** *Id.*

**55.** 968 S.W.2d 670 (Ky.1998).

**56.** *See* LAWSON, *supra* note 33, § 8.65[10], at 693 ("The pre-Rules law defined the business records exception to include coverage of medical records, and . . . KRE 803(6) does the same." (footnote omitted)).

that it appears to allow business records to be authenticated without extrinsic evidence under KRE 902(8) by simply attaching a separate notarized document to them instead of following the procedure outlined in KRE 902(11). Business records, including medical records from out-of-state hospitals, must be authenticated by a live foundation witness or meet one of the foundation exceptions listed in KRE 803(6), namely KRS 422.300, another statutory exception, or KRE 902(11).

■■■ Thus we are left to evaluate the medical records in this case under KRE 902(11). KRE 902(11)(A) states that business records fall under the self-authentication exception so long as there is no indication of a lack of trustworthiness in the sources of the information and the custodian of the record certifies that the record:

(i) Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(ii) Is kept in the course of the regularly conducted activity; and

(iii) Was made by the regularly conducted activity as a regular practice.

Given that the information was provided for medical treatment or diagnosis, we do not have concern over the trustworthiness of the information contained in the records. However, the certification document attached to the medical records in this case does not say that the records were made at or near the time of the occurrence of the matters set forth, that they were made by a person with knowledge of the matters, or that the records were regularly kept. Though the General Assembly probably assumed that these facts would exist with regard to most medical records when it enacted the KRS 422.300 exception, it did not extend that statute to cover records from out of state hospitals. As such, for these records from an out-of-state hospital to fall under the KRE 902(11) exception, the custodian must certify the facts listed in KRE 902(11)(A) to be true.

Because the certification attached to the records in this case fails to meet the requirements of KRE 902(11), the self-authentication exception does not apply. And because the prosecution presented no evidence to establish a proper foundation for the admission of the hospital records, the trial court improperly admitted the records.

■■■ Nonetheless, we decline to disturb the final judgment of the trial court because the admission of the hospital records was harmless error.[57] If the Appellant was not prejudiced by the introduction of the records, then we cannot reverse his conviction. Our harmless error standard requires "that if upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different, the irregularity will be held nonprejudicial."[58]

The trial court's erroneous admission of the medical records did not change the outcome of the trial proceedings. Unlike the medical record in *Bell*, which we de-

---

**57.** RCr 9.24 ("No error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.")

**58.** *Abernathy v. Com.*, 439 S.W.2d 949, 952 (Ky.1969), *overruled on other grounds by Blake v. Com.*, 646 S.W.2d 718 (Ky.1983).

scribed as a "damning piece of evidence,"[59] it is unlikely that the records in this case were important in securing the conviction. Appellant claims that the prosecutor used the medical records to disprove his theory that he had consensual sex with Mrs. Anderson (though again, we note that Appellant himself presented no evidence at trial that the sex was consensual). But the medical records do little to support the conclusion that Mrs. Anderson and Appellant had any sexual contact or that any such contact was a product of coercion rather than consent. Admittedly, the records do describe bruises on Mrs. Anderson's arms, and they repeat Mrs. Anderson's accusation that someone she knows raped her, but they do not list the name of the alleged rapist, and they include the examining doctor's finding that there is "no obvious evidence of trauma to the external genitalia" and his impression that the incident was an *alleged* rape." Furthermore, evidence that Mrs. Anderson had bruises on her arms and that she had been raped by someone she knew had already been introduced through her own and Detective Anderson's testimony. As a result, we find that there is "no substantial possibility that the result would have been any different" had the medical records not been admitted into evidence.

Moreover, the lack of prejudice is also apparent in the prosecutor's treatment of the medical records at trial. The prosecutor mentioned the records just once after the trial judge announced his decision to admit them into evidence. This reference occurred during closing arguments when the prosecutor made the transition from an extensive explanation of the incriminating audio tape to his conclusion by telling the jury, "I'd encourage you to look at these pictures, at these documents, at the medical records—the medical record does iden-

tify the bruise that was on her arm—but most importantly, listen to the tape." The tape recording contained several damning statements, including repeated pleas from Appellant to keep "the law" out of it and promises never to hurt Mrs. Anderson again. It is likely that these statements sealed Appellant's fate, not any prejudice that might have resulted from the admission of the inconclusive and ambiguous medical records. Because the denial of relief that Appellant has requested under this claim is not inconsistent with substantial justice, we will not reverse Appellant's conviction.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Rowan Circuit Court.

LAMBERT, C.J.; GRAVES, JOHNSTONE, SCOTT and WINTERSHEIMER, JJ., concur.

COOPER, J., concurs by separate opinion.

COOPER, Justice, concurring.

I concur in the result reached by the majority, not because the admission of the records of Cabell Huntington Hospital was an alleged "harmless error," but because the alleged error in the introduction of those records was not preserved for appellate review. I strongly disagree with the majority's analysis of KRE 902(8) and its unnecessary decision to overrule *Young v. Commonwealth,* 968 S.W.2d 670 (Ky.1998), which holds that out-of-state criminal (public) records are self-authenticating under KRE 902(8). Finally, I disagree with the majority's conclusion that the admission of evidence of "other crimes, wrongs, or acts" under KRE 404(b)(1) is reviewed only for abuse of discretion. *Ante,* at 19.

59. *Bell v. Commonwealth,* 875 S.W.2d 882, 888 (Ky.1994).

## I. MEDICAL RECORDS.

Appellant and the victim, M.A., were neighbors. On November 16, 2002, Appellant drove M.A. to Morehead, where M.A. obtained an Emergency Protective Order (EPO) against her husband. Later that night, Appellant and M.A. engaged in sexual intercourse at M.A.'s residence. M.A. testified that Appellant raped her. Appellant claims the intercourse was consensual (though he did not testify at trial). Two days later, M.A. met with her husband in Mt. Sterling and told him that Appellant had raped her. The two drove together to Cabell Huntington Hospital in Huntington, West Virginia, because M.A.'s husband was afraid he would be arrested for violating the EPO if they went to a hospital in Kentucky. It is the admission of the medical records pertaining to this emergency room visit that the majority concludes was "harmless error."

*A. If there was error, it was not harmless.*

The emergency room report dictated by Dr. Bryan N. Chapman reflects that his examination revealed "[n]o evidence of trauma" of the genitalia and a "minimal ecchymosis and tenderness just above the bilateral elbows." The report also describes in detail M.A.'s version of the events, *viz:*

> This pleasant and cooperative 39–year-old white female relates that this evening someone, whom she knows, watched her as she left the bathroom. When she got out of the bathroom, she states that he threw her on the bed and held her down against her will. Whereupon doing this, again she was resisting the whole time, he took her clothes off and inserted his erected penis into her vagina. She states that she continued to put up a resistance all along throughout all of this occurrence.

The emergency room records also contain a nurse's note handwritten by Marsha Taylor, R.N., that M.A. "stated she had been raped by known assailant on Sat. 11–16–02."

The only other evidence offered to prove that the intercourse was not consensual was M.A.'s own testimony and a secretly tape-recorded conversation in which Appellant apologized to M.A. and her husband, promised never to hurt M.A. again, and asked them not to involve the law. However, Appellant did not admit during this conversation that he had raped M.A. Unlike the majority, I do not regard this ambiguous tape-recorded conversation as so damning as to render harmless the introduction of the medical records, which substantially bolstered M.A.'s claim of rape. "The relevant inquiry under the harmless error doctrine 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Jarvis v. Commonwealth*, 960 S.W.2d 466, 471 (Ky.1998) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). This is the same "harmless error" standard reaffirmed in *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless." *Id.* at 23–24, 87 S.Ct at 828. The medical records confirmed M.A.'s claim that she suffered bruising as a result of her encounter with Appellant. They also contained a prior consistent statement made two days after the event. Obviously, this evidence "might have contributed to the conviction."

*B. If there was error, it was not preserved.*

The majority opinion concludes that the hospital records were not properly authen-

ticated under either KRE 902(8) or KRE 902(11). However, when the records were offered into evidence, Appellant did not object on grounds of improper authentication (in fact, a review of the videotape of the trial reveals that defense counsel did not even examine the custodian's certification/affidavit), but only objected on grounds that he was denied his right to confront the witnesses against him, specifically, his right to cross-examine the doctor and the nurse. The hearsay issue raised by Appellant is, of course, resolved by KRE 803(6), the business records exception to the hearsay rule. Since Appellant did not raise the authentication issue concerning which the majority finds error, it was not preserved for appellate review. *Gabow v. Commonwealth*, 34 S.W.3d 63, 75 (Ky.2000) ("Where a party specifies his grounds for an objection at trial, he cannot present a new theory of error on appeal."); *Tamme v. Commonwealth*, 973 S.W.2d 13, 33 (Ky.1998) ("Error is not preserved if the wrong reason is stated for the objection."); *Ruppee v. Commonwealth*, 821 S.W.2d 484, 486 (Ky.1991) ("A new theory of error cannot be presented on appeal.").

*C. A sworn certification satisfies the requirements of KRE 902(8).*

The majority wrongly concludes that a certification of a records custodian sworn to before a notary public is insufficient to satisfy KRE 902(8). This conclusion is premised upon a hypertechnical distinction between jurats and certificates of acknowledgment. *Ante*, at 26. That erroneous conclusion will unjustifiably exclude many otherwise self-authenticating documents from the ambit of KRE 902(8). That is especially true of documents admissible under the public records exception to the hearsay rule, KRE 803(8), which does not require the same strict foundation requirements as the business records exception, KRE 803(6). *See Prater v. Cabinet for Human Res.*, 954 S.W.2d 954, 957–58 (Ky. 1997). The documents admitted in *Young v. Commonwealth* were out-of-state criminal records that qualified as public records and did not need to satisfy the more stringent requirements of KRE 902(11), which pertains only to business records. 968 S.W.2d at 674.

KRE 902(8) provides for self-authentication of "[d]ocuments accompanied by a certificate of acknowledgment executed in the manner provided by law before a notary public or other officer authorized by law to take acknowledgments." Professor Lawson notes that the Rule "is silent with respect to the specific contents of acknowledgments (requiring only that they be executed as provided by law)." Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 7.15[3], at 520 (4th ed. Lexis-Nexis 2003). KRS 423.130 is the source of substantive requirements for acknowledgments, requiring the person taking the acknowledgment to certify only that:

(1) The person acknowledging appeared before him and acknowledged he executed the instrument; and

(2) The person acknowledging was known to the person taking the acknowledgment or that the person taking the acknowledgment had satisfactory evidence that the person acknowledging was the person described in and who executed the instrument.

KRS 423.140, which governs the acceptance of certificates of acknowledgment performed outside of Kentucky, demonstrates that the term "acknowledgment" is intended to be an inclusive concept:

The form of a certificate of acknowledgment used by a person whose authority is recognized under KRS 423.110 *shall be accepted* in this state if:

(1) The certificate is in a form prescribed by the laws or regulations of this state;

(2) The certificate is in a form prescribed by the laws or regulations applicable in the place in which the acknowledgment is taken; or

(3) The certificate contains the words "acknowledged before me," *or their substantial equivalent.*

(Emphasis added.) Rather than take a restrictive approach to the acceptance of out-of-state acknowledgments, the General Assembly provided three instances in which they must be accepted. This fact, as well as the "substantial equivalent" language of subsection (3), demonstrates that the Kentucky concept of an "acknowledgment" is not restricted to the technical definitions cited by the majority, but rather is governed by substance.

The majority cites *Hub City Wholesale Electric, Inc. v. Mik–Beth Electrical Co., Ltd.,* 621 S.W.2d 242 (Ky.App.1981), for the proposition that acknowledgments and jurats are distinct concepts. *Ante,* at 26. The distinction between an acknowledgment and a jurat is indeed significant where the law requires a sworn statement, *i.e.,* a jurat, as was the case in *Hub City,* 621 S.W.2d at 243. Where the law requires only an acknowledgment, however, it is a distinction without a difference. Obviously, an affidavit is a higher form of authentication than an acknowledgment.

> An acknowledgment consists of an oral declaration of the party executing the instrument and a written certificate attesting to the oral declaration. An acknowledgment does not constitute an "affidavit" because it does not purport to be a certification that the person acknowledging it swears to the truth of the matter set out. A requirement that a paper be "sworn to" contemplates the execution of an affidavit that the facts contained in it are true, and not an acknowledgment.

3 Am.Jur.2d *Affidavits,* § 2 (2002) (footnotes omitted).

KRE 902(8) is virtually identical to Federal Rule 902(8), substituting only the word "before" in place of the Federal Rule's word "by." Like Kentucky, most states that have adopted the federal rules have also adopted Rule 902(8). Every jurisdiction that has addressed the issue has held that foreign public records accompanied by a certification, such as the criminal records admitted in *Young v. Commonwealth,* are self-authenticating under Rule 902(8). *E.g., Raley v. Parke,* 945 F.2d 137, 141–42 n. 4 (6th Cir.1991) (certified copy of guilty plea form), *rev'd on other grounds by Parke v. Raley,* 506 U.S. 20, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992); *United States v. M'Biye,* 655 F.2d 1240, 1242 (D.C.Cir. 1981) ("[T]he Chang affidavit fits squarely within Rule 902(8) .... The Chang affidavit [attesting to the absence of a public record, Rule 803(10)] was executed and sworn to before a notary public of the State of New York, in accordance with the law of the state."); *People v. Jenkins,* 717 P.2d 994, 995 (Colo.Ct.App.1985) (foreign record of criminal conviction certified as true and correct by records custodian and acknowledged before notary); *Giles v. District of Columbia,* 548 A.2d 48, 56–57 (D.C.1988) (notarized chemist's report of analysis of controlled substance); *McLeod v. State,* 56 S.W.3d 704, 709–10 (Tex.Ct. App.2001) (foreign abstract of record and fingerprint card regarding prior conviction certified by the custodian of the records and notarized by notary public). The majority opinion's holding to the contrary will require custodians of out-of-state criminal records to appear in person at Kentucky trials whenever the Commonwealth wishes to seek sentence enhancement on the basis of a prior out-of-state conviction.

In addition, many courts have held that private and business records, as well as

mere affidavits, are self-authenticating under Rule 902(8). *E.g., Instituto Nacional de Comercializacion Agricola (Indeca) v. Cont'l III. Nat'l Bank & Trust Co. of Chicago,* 576 F.Supp. 991, 995–96 (N.D.Ill. 1983) (affidavit of custodian of corporate records authenticating attached documents, including contract claimed to have been breached); *In re Mezvinsky,* 265 B.R. 681, 692 n. 19 (Bankr.E.D.Pa.2001) ("While the Slosberg Appraisals are sworn and notarized and thus self-authenticating, Fed.R.Evid. 902(8), the Young Inventory is not authenticated by affidavit or deposition testimony."); *United States v. Woodard,* 39 M.J. 1022, 1026 (A.C.M.R.1994) (affidavit describing child sexual offender treatment program); *Barnes v. Barnes,* 311 Ark. 287, 843 S.W.2d 835, 840 (1992) (notarized paternity test results); *City of Westminster v. MOA, Inc.,* 867 P.2d 137, 141–42 (Colo.Ct.App.1993) (report of investigation attached to sworn response to interrogatory), *abrogated on other grounds by Mitchell v. Wilmore,* 981 P.2d 172, 175 (Colo.1999); *Lister v. NationsBank,* 329 S.C. 133, 494 S.E.2d 449, 453 (Ct.App.1997) (affidavit of Aruban attorney explaining applicable law of Aruba).

Professors Mueller and Kirkpatrick provide the clearest guidance on the admissibility of affidavits of authentication under FRE 902(8):

> In addition to executing certificates of acknowledgment, notaries administer oaths and certify (by means of what is usually called a "jurat") that a particular witness gave certain testimony or made a certain statement under oath, or that an affiant executed an affidavit under oath. Although FRE 902(8) specifically embraces only acknowledged documents, the responsibility of a notary at least to ascertain the identity of a witness or affiant, and correctly to certify that he "swore to" his testimony or statement, justifies treating sworn documents accompanied by the notary's jurat as self-authenticating too. Of course, acknowledged documents are likely to have non-hearsay significance in a case, or to fit within the hearsay exceptions for property records or documents affecting property interests, while sworn statements may fall outside all the hearsay exceptions. But, if a sworn statement satisfies a hearsay exception or is offered for a nonhearsay use, the notary's jurat should obviate the need for extrinsic evidence of authenticity.

5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 546, at 199 (2d ed.1994).

For authentication purposes, there is no principled difference between a formal certificate of acknowledgment and a jurat verifying that an affiant swore to his own signed statement. Because KRE 902(8) requires only that acknowledgments be executed as provided by law, and because Kentucky law views acknowledgments with an eye toward substance over form, I would hold that an affiant's own statement, signed, sworn, and accompanied by a jurat, passes muster as self-authenticating under KRE 902(8). Moreover, because of the lesser foundation requirements imposed by the Rules of Evidence upon parties seeking to introduce public records, *Prater,* 954 S.W.2d at 957–58, certified copies of out-of-state public records should be considered as self-authenticating under KRE 902(8). To hold otherwise would place an undue burden upon the Commonwealth in any case in which it seeks sentence enhancement based on a prior out-of-state conviction. Finally, I agree with the majority that application of KRE 902(8) to business records would render KRE 902(11) superfluous. If the custodian of the hospital records in this case had additionally sworn that the entries in the records were "made, at or near the time of the occurrence of

the matters set forth, by (or from information transmitted by) a person with knowledge of those matters," such, coupled with the statements already present in her affidavit, would have satisfied the foundational requirements of KRE 902(11). Since Appellant did not object to either the foundation for the business records or their authentication, that issue is not before us for review.

## II. STANDARD OF REVIEW OF KRE 404(b)(1) EVIDENCE.

In reviewing the admission of evidence of Appellant's prior misdemeanor charge of terroristic threatening against M.A.'s husband (who filed the criminal complaint that led to the charge), the majority opinion states that "[w]e will not disturb a trial court's decision to admit evidence absent an abuse of discretion." *Ante*, at 19. That is only partially true with respect to evidence offered under KRE 404(b)(1) and is apt to mislead trial courts in future cases.

In *Bell v. Commonwealth*, 875 S.W.2d 882 (Ky.1994), we established a three-part test of admissibility of evidence of other crimes, wrongs, or acts, *viz:* (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect? *Id.* at 889–91.

The "probative value" aspect of the *Bell* test relates to whether there is sufficient evidence that the "other crime, wrong, or act" actually occurred. *Bell*, 875 S.W.2d at 890. *See also Purcell v. Commonwealth*, 149 S.W.3d 382, 400 (Ky.2004); Lawson, *supra*, § 2.25[3][c], at 130–31. It has nothing to do with the weight of the evidence, as suggested by the majority opinion, *ante*, at 19 ("The evidence had immense probative value because, if true, it showed that Appellant had a motive to rape [M.A.], and thus it tended to prove that he committed

the crime."). The "immensity" of the probative value pertains only to the KRE 403 analysis. Whether the "other crime, wrong, or act" actually occurred is a factual inquiry under KRE 104(a) and is properly reviewed under the "clearly erroneous" standard. *United States v. Myers*, 102 F.3d 227, 233 (6th Cir.1996).

The relevancy inquiry relates to whether the evidence is admissible for a "proper purpose" under KRE 404(b)(1), *i.e.*, some purpose other than to prove bad character or propensity. This is a mixed issue of fact and law. Whether the purpose for which the evidence is offered is a "proper purpose" is a question of law that is reviewed *de novo*. *Myers*, 102 F.3d at 233. If the evidence falls within one of the "other purpose" exceptions expressly listed in KRE 404(b)(1), *i.e.*, motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident, the resolution is obvious. However, the listed "other purpose" exceptions are illustrative, not exhaustive. For example, in *Tamme*, 973 S.W.2d at 29–32, evidence strongly suggesting that the defendant had suborned perjury was admissible as evidence tending to prove "consciousness of guilt." And in *Springer v. Commonwealth*, 998 S.W.2d 439, 450 (Ky.1999), evidence of the defendant's voluntary participation in a three-person sexual encounter was relevant to rebut her claim that her husband had forced her to engage in such acts. Whether the evidence tends to prove a valid "other purpose" is a question of fact reviewed for "clear error." *St. Clair v. Commonwealth*, 140 S.W.3d 510, 535 (Ky.2004).

Having determined that the other act actually occurred and that evidence of that act is admissible for a proper purpose, the trial court must then make a KRE 403

determination of whether the probative value of the evidence of the other act is substantially outweighed by its prejudicial effect. *Bell,* 875 S.W.2d at 890. The resolution of that issue, which is essentially a balancing process, is reviewed for abuse of discretion. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).