# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 18, 2019
NOT TO BE PUBLISHED

Supreme Court of Kentucky

2018-SC-000021-MR

DATE 5/9/19 Kim Redman, DC

JOHN GEORGE BOULDER                                    APPELLANT


ON APPEAL FROM FAYETTE CIRCUIT COURT
V.        HONORABLE JAMES D. ISHMAEL JR, JUDGE
NO. 17-CR-00306


COMMONWEALTH OF KENTUCKY                          APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

A Fayette Circuit Court jury found Appellant, John George Boulder, guilty of second-degree assault, fourth-degree assault, and of being a first-degree persistent felony offender. The trial court followed the jury's sentencing recommendation and sentenced Appellant to twenty years' imprisonment. Appellant now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that the trial court erred in: (1) precluding Appellant from admitting his medical records and (2) exceeding the scope of RCr 9.57 when giving the jury an *Allen* charge. For the following reasons, we affirm the trial court.

## I. BACKGROUND

Appellant and his then-girlfriend, Nita Catching, attended a Super Bowl party at Appellant's brother's home. When Appellant wanted to leave the party, Catching wanted to stay and the two argued. Finally, Appellant left Catching at the party. After numerous calls from Catching, Appellant returned to his

brother's house and picked her up. The two then went to their apartment, where they continued arguing. Appellant alleges that, at the apartment, he slapped Catching after she threw a cup of water in his face. Catching's account is that Appellant hit her in the face, blackening her eyes. After striking Catching, Appellant left their apartment.

During the altercation, Page Watson and Lisa Ware, Appellant and Catching's upstairs neighbors, heard Catching call out for help. Ware testified that she and Watson had heard Appellant and Catching arguing off and on for about a year. However, this was the first time they heard Catching cry out for help. Ware said it took Catching a few minutes to answer the door when they knocked, and that, when she did, she had bruises on her face and was crying. Ware testified that Catching said Appellant "was going to come and kill her." Watson testified that Catching told him and Ware that "someone" was trying to kill her. Catching testified that, once in the apartment, Watson pulled out a knife and said "I don't believe in men hitting women . . . if he comes back here and messes with you again, I'm gonna cut him." Thereafter, Catching called Appellant's sister-in-law, Diana Boulder, to come pick her up. Watson and Ware waited outside with Catching for her ride.

Appellant returned to the apartment complex around the same time Diana Boulder arrived. Testimony was presented at trial as to the events that followed by several witnesses.

Appellant testified that Watson walked up to him and started swinging his arm. According to Appellant, he (Appellant) only had his cellphone in his

2

hand at the time. However, several other witnesses testified he was holding a knife behind his back—many describing the knife in detail. Appellant insists that he grabbed Watson's arm to stop him from swinging and that, while he could not remember exactly what happened, his face felt strange. Appellant soon realized his face had been cut during the altercation. As he went back toward his apartment, Appellant heard Ware say that she was taking Watson to the hospital. Appellant called an ambulance and was transported to the hospital and treated before being placed under arrest.

Catching's testimony concerning the altercation between Appellant and Watson varied substantially from Appellant's. According to Catching, about the same time Appellant's sister-in-law Diana arrived in her car, Appellant ran up to Watson with a knife. She did not see the altercation, but heard Ware say that Watson had been cut and saw the two leave and head toward the hospital.

Diana Boulder testified that after she arrived at the apartment complex, she saw Appellant walking down the yard and then heard someone say "he stabbed me." She saw something shiny in Appellant's hand, but did not know if it was a knife.

Watson testified that after Catching went to Diana Boulder's car, Appellant came walking up. Watson said he approached Appellant and, when he was approximately six feet away, saw Appellant had a knife behind his back. Watson said that after appellant stabbed him in the chest, he was able to pull out his own knife, unfold it, and swing it at Appellant. In the process, Watson

said he was stabbed again under his arm before Appellant backed off. Ware then took him to the hospital.

According to Ware, when Catching went to get in Diana Boulder's car, Appellant walked up with a knife and Watson said something like, "you're not going to hurt her." A fight then ensued. Ware said that, at some point before the fight stopped, Watson pulled out his own knife and cut Appellant's face. When Appellant left, she drove Watson to the hospital. At the hospital, she told police that Watson had gotten between Catching and Appellant prior to the altercation.

Officers arrived on the scene after the fight between Appellant and Watson. They searched for the knife witnesses indicated Appellant had, but were unable to recover one from the scene. They also followed Appellant's trail of blood in the apartment and parking lot, but could not find a knife. Appellant contends he never had a knife—that Watson was the only one with a knife.

Appellant was charged with first-degree assault for his actions regarding Watson and fourth-degree assault for his actions toward Catching. As to count one (first-degree assault), the jury was instructed on first-degree assault and the lesser-included offenses of second- and fourth-degree assault. After deliberating for more than four hours, the jury sent a note to the trial judge informing the court they were hung as to count one. The trial court then delivered an *Allen* charge to the jury. The jury then returned forty minutes later with a verdict finding Appellant guilty of second-degree assault as to Watson and fourth-degree assault as to Catching. During the penalty phase,

4

the jury found Appellant to be a first-degree persistent felony offender and recommended a sentence of twenty years' imprisonment. The trial court sentenced him accordingly. This appeal followed.

## II. ANALYSIS

### A. Medical Records

During Appellant's testimony, defense counsel attempted to introduce Appellant's medical records into evidence. The Commonwealth objected and the trial court ruled the defense could not introduce the records. Appellant argues this ruling was erroneous and in violation of his rights to present a meaningful defense and to a fair trial.

At trial, defense counsel pointed out that the records were self-authenticating. The trial court acknowledged that and stated: "I'm not questioning authenticity. I'm just wondering about admissibility." The Commonwealth had pointed out that it did not believe the entire twenty-five pages of medical records were relevant. The Commonwealth also said it was not disputing the fact that Appellant "got slashed." The trial court sustained the objection, relying on *Young v. J.B. Hunt Transp., Inc.*, 781 S.W.2d 503 (Ky. 1989)..

KRE 901(a) reads: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 902 states that some records do not require "extrinsic evidence of authenticity," as they are "self-authenticating." KRS 422.300(2) provides, in

pertinent part: "Medical charts or records of any hospital . . . that are susceptible to photostatic reproduction may by proved as to . . . authenticity without any preliminary testimony, by use of legible and durable copies, certified in the manner provided herein . . . ." There was no dispute at trial that the records were self-authenticating.

In fact, the trial court acknowledged the issue was not authenticity. It was correct that authenticity is not the sole question when determining whether evidence should be admitted. Rather, authentication is a "condition precedent to admissibility." As this Court has held, "the establishment of authenticity of a document does not necessarily mean that the document is admissible because there may be other barriers, e.g., hearsay, to its admission." *Matthews v. Commonwealth*, 163 S.W.3d 11, 23 (Ky. 2005).

Here, the self-authenticating records also fit within an exception to the general rule against hearsay. Kentucky Rules of Evidence (KRE) 803(6)(A) provides: "A custodian or other qualified witness . . . is unnecessary when the evidence offered under this provision consists of medical charts or records of a hospital that has elected to proceed under the provisions of KRS 422.300 to 422.330 . . . ." These were such records. Even though the records were properly authenticated and qualified under an exception to the general prohibition against hearsay, that does not mean the trial court was obliged to admit them.

Trial courts are tasked with determining whether the evidence a party seeks to admit is relevant pursuant to KRE 401. Furthermore, "[a]lthough

6

relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. On appellate review, we will not overturn a trial court's evidentiary rulings absent an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Here, the Commonwealth argued many of the records were irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. The trial court allowed the records to be introduced by avowal for purposes of appellate review. KRE 103(a)(2). After a thorough review of those records, this Court notes it is questionable whether some of the records have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*

The records do reveal some relevant information such as "58 y male involved in altercation suffered two lip lacerations from a knife. . . . Was able to stop the bleeding with some pressure." And later, "[r]ight lower lip with laceration through the vermillion border about 2.5cm. Left oral commissure

7

laceration through and through about 3cm." In a report by another doctor the records state: "Patient's injuries are isolated to his face. Lower lip laceration is hemostatic. The laceration to his oral commissure was visualized and given significant extension and difficulty to achieve per his medical care, ENT was consulted for evaluation and repair." The records also described that the lacerations were closed by absorbable sutures.

However, in addition to the relevant information, the records also contained pages of irrelevant information, which sometimes contradicted Appellant's own testimony. For example, Appellant indicated that he never drank alcohol when asked by various medical providers, in spite of the fact that he testified that he was drunk on the night in question. The records also contain several pages of screening questions documenting Appellant's answers to questions about his educational level, whether he had been the victim of domestic abuse at home, and his religious and cultural considerations. Those questions have no relevance to the case at bar.

While the records do contain some irrelevant information, at least portions of the medical records did meet the low bar for relevancy. *Blair v. Commonwealth*, 144 S.W.3d 801, 808 (Ky. 2004) ("To show that evidence is relevant, only a slight increase in probability must be shown.").

Even assuming all of the records were relevant, that is not the last step in determining whether the trial court abused its discretion in disallowing the records. As we have held:

> a relevant piece of evidence may be excluded if its probative value
> is substantially outweighed by undue prejudice, confusion of the

8

issues, misleading the jury, undue delay, or presentation of cumulative evidence. KRE 403. A proper balancing under KRE 403 requires that a trial court consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth. *Barnett v. Commonwealth,* 979 S.W.2d 98, 100 (Ky.1998). Thus, if the possibility of undue prejudice outweighs the probative worth of the evidence presented, it should be excluded.

*Yates v. Com.,* 430 S.W.3d 883, 897 (Ky. 2014).

Here, the trial court found the records to be inadmissible after asking defense counsel if he planned to have a doctor testify to explain the medical records. Defense counsel responded that he was not going to have a doctor testify, but that he had asked the Commonwealth's expert to explain some of the medical terms included in the records during cross-examination. The trial court indicated it based its ruling on *Young v. J.B. Hunt Transp., Inc.,* 781 S.W.2d 503 (Ky. 1989).

In *Young,* this Court reversed the Court of Appeals, stating:

In its opinion reversing the trial court, the Court of Appeals took the position that mere compliance with KRS 422.300 was sufficient to require admission of the prior hospital records. We believe this view is too expansive. This statute is merely a convenient device for authenticating medical records. It does not assure their admissibility or abrogate other rules of evidence relating to the admission of documentary evidence. In *Commonwealth v. Willis,* Ky., 719 S.W.2d 440, 441 (1986), this Court construed KRS 422.020(4), a similar statute relating to public records, as "a device providing the method for authentication of an official record which is otherwise admissible" and such a construction is appropriate here.

781 S.W.2d at 508. The Court then determined that the trial court had not erred in excluding the medical records sought to be introduced. We stated,

9

based on KRE 403, "if appellant's voluminous prior hospital records had been admitted in mass and without the prior treating physician or any physician available to explain the records, . . . there is probability that distortion, confusion or misunderstanding would have resulted." *Id.*

Appellant argues that we should not follow *Young* because it was a civil case. However, the applicable evidentiary rules and standards of review are the same in *Young* and in the present case. Furthermore, this Court has cited *Young* in other criminal cases. *See Matthews*, 163 S.W.3d at 23; *Bell v. Commonwealth*, 875 S.W.2d 882, 887 (Ky. 1994). Appellant would also have us distinguish *Young* on the basis of the complexity of the medical records and when the party sought to have them admitted. We decline to do so. Just as in *Young,* the trial judge here was concerned that the records would come in without a medical expert to explain them. This could lead to the confusion and misunderstanding of jurors.

Furthermore, KRE 403 allows the exclusion of the "needless presentation of cumulative evidence." The Commonwealth never disputed the fact that Appellant sustained lacerations to his face during his altercation with Watson. Catchings, Watson, Ware, two police officers, and Appellant all testified that Appellant was cut on the face during the fight.

Appellant points to the fact that the Commonwealth stated in closing that "everything that defendant said on the stand was a bald faced lie." He argues that, due to this statement, the jury could have believed Appellant was exaggerating his injuries. However, we find no credence in that argument as

10

no less than five of the Commonwealth's own witnesses acknowledged his injuries in addition to Appellant's explanation of them. Further, we have consistently held that opening and closing arguments are not evidence and prosecutors have a wide latitude during both. *Stopher v. Commonwealth*, 57 S.W.3d 787, 805–06 (Ky. 2001).

For the aforementioned reasons, we cannot hold that the trial court's exclusion of Appellant's medical records amounted to an abuse of discretion.

## B. *Allen* Charge

Appellant next argues the trial court erred when it exceeded the scope of Kentucky Rules of Criminal Procedure (RCr) 9.57 in giving the jury an *Allen* charge. In accordance with *Allen v. United States*, 164 U.S. 492, 501 (1896), RCr 9.57(1) provides:

> If a jury reports to a court that it is unable to reach a verdict and the court determines further deliberations may be useful, the court shall not give any instruction regarding the desirability of reaching a verdict other than one which contains only the following elements:
>
> (a) in order to return a verdict, each juror must agree to that verdict;
>
> (b) jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
>
> (c) each juror must decide the case, but only after an impartial consideration of the evidence with the other jurors;
>
> (d) in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous; and

11

(e) no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors, or for the mere purpose of returning a verdict.

We have held that "The mandatory language in RCr 9.57(1) does not require a verbatim recital of the elements outlined therein so long as the instruction sets forth those elements and no other elements." *Commonwealth v. Mitchell*, 943 S.W.2d 625, 627 (Ky. 1997). If a judge's remarks to the jury exceed the RCr 9.57(1) instruction, "as an impromptu and perhaps ill-advised response to the jury's inquiry [it is] considered as a separate statement independent of the RCr 9.57(1) instruction, [and] the issue becomes whether the comment itself was coercive." *Mitchell*, 943 S.W.2d at 627-28.

In *Mitchell*, this Court did not adopt the time lapse test some jurisdictions utilize in determining the presence of coercion in the trial judge's comments to the jury. *Id.* Rather, we reiterated that "[o]ur test always has been to look at the language of the statement or instruction itself to determine whether it actually forced an agreement or whether it merely forced deliberations resulting in an agreement. *Id.* at 628. This Court stated, "we have long held that statements which merely impress upon the jury the propriety and importance of coming to an agreement do not rise to the level of reversible error." *Id.* Finally, we held, "[b]ut even if the law were otherwise, any possibility of coercion was vitiated by the trial judge's subsequent instruction to the jurors that they should not surrender their honest convictions for the mere purpose of obtaining a verdict." *Id.*

12

With that body of law in mind, we will turn to the facts of the current case. After deliberating for more than four hours, the jury foreperson sent a note to the trial judge indicating that the jury was hung on count one (first-degree assault) and requesting the trial judge's counsel before making the determination that they should cease deliberations. Prior to bringing the jury back in the courtroom, the trial judge discussed the note with counsel, saying:

> I'm going to make a determination that further deliberations will be useful. I'm just going to encourage them to go back, try it again, you're the best jury I've ever seen in all my life, you know, something like that. And, uh, so, you know, put on the record anything you want to do, you object, or whatever you want to do, so, that's what I'm proposing.

Neither party objected to the court's proposed action. In light of this lack of preservation, Appellant requests that we review this claim of error for palpable error pursuant to RCr 10.26. "Palpable error affects the substantial rights of the party and results in manifest injustice. Furthermore, an appellant claiming palpable error must show that the error was more likely than ordinary error to have affected the jury." *Boyd v. Commonwealth*, 439 S.W.3d 126, 129-30 (Ky. 2014). The "required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

When the trial judge brought the jury back in to the courtroom, he gave the jury the RCr 9.57(1) instruction (*Allen* charge), but also included some additional language. It is the trial court's additions to which Appellant now objects. Specifically, in addition to giving the RCr 9.57(1) language, the trial court said:

13

Ladies and gentlemen, the attorneys and I are in agreement that you all have worked above and beyond the call of duty. You endured our, uh, delay today in preparing the instructions. You have been very focused. You have been very attentive. You have been exactly what the process calls for. Hold your head up because you have performed admirably in your responsibilities for our community.

You know that if we declare a mistrial that we will basically have to redo this again and another jury will have to consider it. I don't know that we can get a better jury than you all. Now, that's not to say that the court is rushing you to judgment.

Let me just give you a few of my thoughts for your consideration and, um, then we'll, we'll, uh, proceed ahead that way. You all know these things, but I just want to kind of put them on the record. [The trial judge then gave the jury the *Allen* charge.]

. . . .

[Following the *Allen* charge the Court continued:] The court would greatly appreciate it if you all could return to the juror room. Please consider these several thoughts of the court. Reconsider, uh, everything is on the table. Talk to each other honestly, um, consider each other's opinions. I'm not asking you to violate your conscience or your firmly held convictions. I'm not asking you to do that. Just consider this matter. Give it another shot. Just give it another shot.

I, I, I'm prohibited from asking you the split. I don't want to know the split. I just ask that everybody be open and honest in your conviction and in your judgment. Just give it another shot. If you really haven't made any progress in some reasonable period of time, come back in. I'm not going to hold you captive. Nobody's gonna get sequestered, you know? Just give it one more shot, for me. Can I ask you to do that?

[A juror responded "yes."]

I really would appreciate it. You've been a great jury. I'm gonna ask you to return, continue with your deliberations. Just let us know how you're doing. Can I do anything else for you? Does anybody need some more candy or some mints? . . . Thank you all very much. Give it your best shot and let us know.

Forty minutes after the *Allen* charge, the jury returned with a verdict of guilty of second-degree assault as to count one. Appellant makes much ado of the time period. However, we take this opportunity to reaffirm our holding in

14

*Mitchell* refusing to adopt the time lapse test as a factor in determining coercion.

Appellant contends that the trial judge's comments amounted to impermissibly adding additional elements to RCr 9.57. Just as in *Mitchell*, the trial court here engaged in some "impromptu and perhaps ill-advised" comments to the jury. 943 S.W.2d at 627-28. However, we hold that, just as in *Mitchell*, the comments did not "actually force[] an agreement"; rather, they "merely forced deliberations resulting in an agreement." *Id.* at 628. The fact that he asked the jury to "give it another shot, for me," and flattered the jurors by complimenting them and telling them he did not know "that we can get a better jury than you all" in the event of a hung jury and resultant mistrial did not amount to coercion. Furthermore, "any possibility of coercion was vitiated by the trial judge's subsequent instruction to the jurors that they should not surrender their honest convictions for the mere purpose of obtaining a verdict." *Id.* Here, the trial judge specifically told jurors, "I'm not asking you to violate your conscience or your firmly held convictions."

We hold the trial court did not err (much less commit palpable error) in giving the *Allen* charge.

### III. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions and corresponding sentence.

Minton, C. J.; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. Buckingham, J., not sitting.

15

COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Mark Barry
Assistant Attorney General