# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: AUGUST 24, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0031-MR

FLOYD J. SEXTON                                                                APPELLANT

ON APPEAL FROM FLOYD CIRCUIT COURT
V.               HONORABLE THOMAS M. SMITH, JUDGE
NO. 14-CR-00216

COMMONWEALTH OF KENTUCKY                                            APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Floyd J. Sexton appeals as a matter of right[1] from the Floyd Circuit Court judgment sentencing him to life in prison for his murder conviction. On appeal, he raises numerous evidentiary errors which he claims warrant reversal of his conviction. After thorough review of the record and applicable law, we affirm.

## I. Facts and Procedural Background

Sexton was convicted by a Floyd County jury for murdering Bill Collins with a .45 caliber pistol on November 5, 2014. Sexton's motivation for the murder allegedly stemmed from a falling out between him and Collins, which

---

[1] KY. CONST. § 110(2)(b).

led to Collins being kicked out of the Anarchy Militia motorcycle club to which they both belonged, and of which Sexton was the president. After ejecting Collins from the biker club, Sexton gave Collins' Anarchy Militia vest to the club's prospective member, John Maggard. Sexton's animosity toward Collins persisted, and he badgered a mutual friend of theirs, Jessica Battaglia, to bring Collins to him for a meeting. At one point before the meeting, Sexton told Battaglia that he had a "45 and a shovel" for Collins.

On the morning of November 5, Collins and Battaglia met up with plans to spend the weekend together. Sexton messaged Battaglia, directing her to ask Collins if he had a gun. She did, and Collins indicated that he had a gun, but refused to show it to her. Battaglia continued to ask him to show it to her and Collins got angry, got out of her vehicle, and set out on foot.

Thereafter, Battaglia convened with Sexton, Maggard, Jennifer Jernigan (Sexton's girlfriend), and another mutual friend, Liz Robertson. Battaglia informed them that Collins had set out on foot. It had begun to rain, and Battaglia contacted Collins and convinced him to let her pick him up. Battaglia and Robertson picked up Collins, and Battaglia told him she wanted to stop at an abandoned office building to pick up some drugs. This story about picking up drugs was a ruse concocted by Sexton to surreptitiously lure Collins to the building, where he would be waiting inside. Battaglia and Robertson both testified that Maggard never participated in the discussion to trap Collins.

2

Battaglia entered the building first, followed by Robertson, then Collins. Jernigan stayed in the car after seeing Sexton go into the building with his gun. When Collins spotted Sexton he said, "Oh it's going to go like this," and ran for the door. Maggard grabbed Collins by the shirt as he tried to run away but Collins wriggled free and ran out the door into the parking lot. Sexton stood in the doorway and fired two shots from his .45 caliber pistol, striking Collins in the leg and torso. The shot to Collins' torso was fatal. The bullet that passed through his chest was caught in his shirt and was discovered during the ensuing investigation. Two shell casings were found, both CCI brand .45 caliber, one of which had the initials "BC" written on it in black marker ink. Jernigan said that after the shooting, Sexton had told her he put Collins' initials (BC) on the bullets. The bullet that passed through Collins' leg was not found, but a hole in a nearby trailer indicated that it may have been caused by the bullet.

After shooting Collins, Sexton ordered everyone to get into Jernigan's car and threatened them not to tell anyone what happened. Sexton smacked Jernigan in the head and told her if she ever ran again, he would kill her. He ordered Jernigan to drop off Battaglia and Robertson at the Coyote Den, a bar in Prestonsburg that they all frequented. Scared and frantic, Battaglia told the bartender what had happened. Battaglia later returned to the crime scene and talked with the police.

Meanwhile, Sexton, Jernigan and Maggard proceeded to a friend's house. There, Sexton told Jernigan, "You know what kind of man you have – I'm a

3

monster." Maggard and his girlfriend left to retrieve some of Sexton's and Jernigan's belongings but were arrested at Jernigan's house. When Sexton caught wind of the arrest, he and Jernigan picked up her son and fled the state, with Sexton's son in tow. For months they traveled to numerous states relying on Sexton's biker contacts to help them remain at large. Sexton repeatedly threatened to kill Jernigan and her son if they tried to leave. Jernigan testified that while at large, she and Sexton smoked large quantities of methamphetamine.

While on the run, Sexton devised a plan to cast another individual, Jody Gibson (who had the same type of gun as Sexton), as the perpetrator and persuaded Jernigan to adopt the story as well. Jernigan testified that Sexton used her phone to send Facebook messages from his "Jay Militia" Facebook account to his mother relaying that Gibson was the murderer and asking his mother to pass that information on to Detective Petrie. Apparently, Gibson had been arrested on unrelated charges in Virginia. Sexton told his mother that the .45 caliber pistol Gibson had on him was the murder weapon. However, at that point, information about the caliber of the murder weapon had not yet been released to the public. The weapon retrieved from Gibson was tested and later determined not to be the murder weapon.

Sexton's last stop was a trailer hideout in Arizona. When Sexton left, he hid his .45 caliber pistol under the trailer and set the trailer on fire. Nearly two years later when police searched the remnants of the trailer, they were unable to locate the gun but found some of Sexton's and Jernigan's belongings, as well

4

as live .45 caliber CCI brand ammunition which had the same markings and was factory-stamped by the same machine as the casings found at Collins' murder scene.

In March 2015, Sexton was pulled over in Texas for a traffic violation and gave the officer a false name before correcting himself. After learning that Sexton was wanted for homicide in Kentucky, the officer placed him in custody where Sexton began divulging that he was part of a biker gang and wanted to speak with federal law enforcement to inform on the gang's involvement in murders, drug trafficking and explosive trafficking. Sexton and Jernigan were extradited back to Kentucky, where Jernigan pled guilty to hindering prosecution. Up to his trial, Sexton maintained the Jody Gibson alternative-perpetrator story but after Jernigan refused to adopt it, he moved on to a theory that Maggard shot Collins.

In a joint trial, the jury was tasked with determining whether Sexton or Maggard shot Collins. At trial, Sexton, Battaglia, Robertson and Jernigan testified. Sexton's defense was that Maggard shot Collins and that Sexton only fled the state to avoid an arrest warrant stemming from his parole violation, not to elude a murder investigation. However, Battaglia and Robertson both testified to witnessing Sexton shoot Collins twice. Jernigan also pinned the murder on Sexton, although she did not witness the shooting. Jernigan testified that shortly after she heard two shots fired, everyone ran to her car and Sexton still had the gun in his hand. Battaglia said that after Sexton got

5

into Jernigan's car, she saw him place the gun under the seat. Maggard exercised his constitutional right to remain silent.

Ultimately, the jury convicted Sexton of murder and acquitted Maggard of facilitation to murder. The trial court sentenced Sexton to life in prison, in accordance with the jury's recommendation. This appeal followed.

## II. Analysis

### a. Evidence that Sexton's prior incarceration led to him losing custody of his son was properly admitted.

This issue is preserved in part. The portion of Sexton's mother's testimony discussing his incarceration was not objected to and thus Sexton requests palpable error review of its admission.[2] As to Sexton's own testimony on cross-examination about why he lost custody of his child, defense counsel did object to that and thus we review its admission under the abuse of discretion standard.[3]

At trial, the Commonwealth called Sexton's mother, Lillie Adams, as a witness. On re-direct examination, the Commonwealth asked if she was

---

[2] Kentucky Rule of Criminal Procedure (RCr) 10.26 provides that "[a] palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." "To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006). In other words, the defect must be "so egregious that it jumps off the page ... and cries out for relief." *Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) (citation omitted).

[3] On appeal, we review the trial court's evidentiary ruling for an abuse of discretion. *Lopez v. Commonwealth*, 459 S.W.3d 867, 873 (Ky. 2015). An abuse of discretion occurs if the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principle." *Id.*

unhappy about Sexton's son living with Sexton and Jernigan, and away from her, even prior to the shooting. Adams responded that a court had awarded Sexton custody of his son after not having custody "because he had got out of jail." Adams elaborated that she had third-party custody because Sexton and his son were living with her while "he was on probation" and Sexton "was not allowed to leave for six months." When Jernigan came and took Sexton and his son with her, "that broke his probation." Defense counsel did not object to this testimony.

During direct examination of Sexton, he testified that Jernigan had ordered him to flee and that he had followed her orders because he feared she would cause him to lose custody of his son again if he did not. On cross, the Commonwealth asked why he had previously lost custody of his son, to which defense counsel objected. During the bench conference, defense counsel argued the Commonwealth was delving into matters that had nothing to do with this case and served only to cast Sexton in a negative light. The trial court overruled the objection, stating "I think he's [the prosecutor] allowed to ask, if he's [Sexton] concerned about losing custody, why he lost custody to begin with." When the Commonwealth asked Sexton again why he lost custody of his son, he replied that it was because he was incarcerated in the Clay County Detention Center in 2014. Defense counsel approached the bench and requested a mistrial, which the trial court denied.

Sexton now argues that neither his nor his mother's testimony should have been admitted. Regarding his testimony, he argues that the

7

Commonwealth eliciting that he lost custody of his son due to his incarceration amounted to inadmissible "other crimes" evidence in violation of KRE[4] 404(b).

"Evidence which is not relevant is not admissible." KRE 402. Relevant evidence is defined as "evidence having tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Generally, evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." KRE 404(b). However, it may be admissible if "offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" or "[i]f so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(1)-(2). The three-prong test of assessing the admissibility of other bad acts evidence under KRE 404(b) includes examining the relevance of the evidence, its probative value, and then balancing any prejudice associated with the other bad acts evidence against its probative value. *Bell v. Commonwealth*, 875 S.W.2d 882, 889-91 (Ky. 1994).

Sexton argues that under the *Bell* test, his testimony was irrelevant because the reason he feared losing custody of his son during the timeline of this case was wholly independent of the reason he lost custody in the past. He

---

[4] Kentucky Rules of Evidence.

8

further asserts that the Commonwealth's questioning deliberately informed the jury that he had committed other crimes or wrongs and that the resulting prejudice of such information was high, since the credibility of the witnesses was of utmost importance in what he characterizes as a "he said, she said" case.

Conversely, the Commonwealth argues that the questions about Sexton's prior loss of custody were relevant to show his motive, intent, plan, and lack of mistake. At trial, Sexton claimed that Jernigan, Battaglia, Maggard, and to some extent Robertson, were behind the plot against Collins. As part of his attempt to separate himself from that alleged conspiracy, Sexton testified that he was forced to be in a relationship with Jernigan because he was scared Jernigan could pose as a social worker and affect custody of his son. In support of this theory, defense counsel called multiple witnesses at trial to corroborate Sexton's claim that Jernigan had posed as a social worker before, had his son removed from his house, and threatened him with loss of custody again if he would not go with her.[5]

Our review of the record shows that Sexton opened the door to his custody issues and the Commonwealth's follow-up question on why he lost custody was aimed at demonstrating Sexton's intent and plan to blame the crime on others and at rebutting this part of his defense. The Commonwealth's

---

[5] At trial, Sexton presented testimony that in October 2014, Jernigan had posed as a social worker, gone to Sexton's mother's house, summoned the police there, and removed Sexton's son from the home. However, Jernigan denied the claim that she had posed as a social worker.

9

questioning revealed that Sexton's prior loss of custody was due to his incarceration, not because of Jernigan's alleged ability to affect custody. The Commonwealth's cross-examination on this issue was also relevant to rebut Sexton's claim that Jernigan had conspired with others against him. "Evidence of collateral criminal conduct is admissible for purposes of rebutting a material contention of the defendant." *Brown v. Commonwealth*, 983 S.W.2d 513, 516 (Ky. 1999). Thus, the trial court did not abuse its discretion in allowing the Commonwealth to cross-examine Sexton on this issue.

Furthermore, the admission of Sexton's mother's testimony was not error, let alone palpable error. Sexton argues that her testimony added to the cumulative damage to his character, but the record reveals otherwise. On re-direct examination, Adams testified that prior to the shooting, Sexton had only recently received custody of his son. The Commonwealth asked about her thoughts on Jernigan and Sexton removing Sexton's son from her house in October before the shooting occurred and she said, "We went to court in Whitesburg. The court [told] him [Sexton] he could have custody of [his son] because he hadn't had custody prior because he had got out of jail before. And so the court gave him custody, as me as a third party to live in my home . . . He was on probation in my home too. He was not allowed to leave for six months."

Again, it was Sexton, on cross-examination of Adams, who raised the status of his custody issues prior to the shooting. Defense counsel asked Adams about an incident in October 2014 when Jernigan allegedly posed as a social worker and procured custody of Sexton's son from Adams. The

10

Commonwealth followed up on re-direct, and Adams volunteered that Sexton and his son were staying with her as part of the custody arrangement because Sexton had been released from jail and was on probation. The Commonwealth did not ask Adams about Sexton's incarceration: she volunteered that information to paint a full picture of the situation.

"Where evidence of other crimes is introduced into evidence through the non-responsive answer of a witness, this court must look at all of the evidence and determine whether the defendant has been unduly prejudiced by that isolated statement." *Phillips v. Commonwealth*, 679 S.W.2d 235, 237 (Ky. 1984). Under the totality of the circumstances, we find that Adams' non-responsive, isolated comment about Sexton's prior incarceration, to which Sexton did not object, certainly does not rise to the level of palpable error. *See, e.g., Matthews v. Commonwealth*, 163 S.W.3d 11, 18 (Ky. 2005) (witness's non-responsive reference to defendant's prior crime was insufficient to create a manifest necessity for a mistrial).

### b. Jernigan's testimony about Sexton pointing a gun at her and the resulting effects on her son did not result in palpable error.

Sexton contends that Jernigan should not have been allowed to testify about him threatening her son when they were in Arizona and the long-lasting effects it had on her son. However, since Sexton did not object to this testimony, our review is limited to palpable error.

At trial, Jernigan testified that while she and Sexton were fugitives, she became sick and wanted to go to the emergency room, but Sexton would not allow her. She testified:

11

Jernigan: I was very ill. I mean very sick. Sick to my stomach, fever, chills. The thing was he said we couldn't go.

Commonwealth: You wanted to go to the ER?

Jernigan: Yes, I did.

Commonwealth: And, he wouldn't let you go?

Jernigan: No. And I told [my son] to get his clothes on, we were going. And, me and [Sexton] got in an argument over it. I told him we were going if he liked it or not. I walked outside, and he got into it with me, and drug me back in the house. He pointed the gun at my son and told me he would kill my son if I walked out that door.

Commonwealth: Sexton pointed a gun at your son?

Jernigan: And to this day my 20-year-old son cannot function.

Commonwealth: What gun did he point at him?

Jernigan: The gun he's always had on him.

Commonwealth: The same gun he had on him the day of the shooting?

Jernigan: Yes.

Sexton claims that Jernigan's statement "And to this day my 20-year-old son cannot function" was improper victim-impact testimony during the guilt phase. However, the Commonwealth did not ask Jernigan about the effects on her son; her volunteering that information was non-responsive and the Commonwealth simply moved past her statement rather than dwelling on it. No palpable error resulted.

### c. Evidence about Gibson's gun retrieved in Virginia was properly admitted.

Next, Sexton avers that the trial court abused its discretion in denying his KRE 401 and 402 motion to exclude evidence about Gibson's gun that was seized in Virginia – specifically, evidence that the gun was not used in the murder of Collins. In denying Sexton's motion, the trial court found that the evidence was relevant for purposes other than bolstering Jernigan's testimony; that is, relevant to rebut Sexton's contrived story that someone else committed the murder and possessed the murder weapon.

While on the run, Sexton sent Facebook messages to his mother alleging that Gibson was the murderer, and his .45 caliber pistol was the murder weapon. At the time he sent the messages, the caliber of the murder weapon had not yet been disclosed to the public. The .45 caliber pistol retrieved from Gibson when he was arrested on unrelated charges in Virginia was tested by Kentucky authorities who determined it was not the weapon used to kill Collins and the jury heard this evidence at trial.

Clearly, evidence that the weapon Sexton claimed Gibson used to carry out the murder was in fact not the murder weapon was relevant and probative. As to its prejudicial effect, KRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." The balancing under KRE 403 "requires that a trial court consider three factors: the probative worth of the evidence, the probability that the

13

evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Hubers v. Commonwealth*, 617 S.W.3d 750, 779 (Ky. 2020).

Still, "KRE 403 does not offer protections against evidence that is merely prejudicial, in the sense of being detrimental to a party's case." *Id.* "Evidence is only unfairly or unduly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Id.* Under KRE 403's balancing test, the probative value of evidence that Gibson's gun was not used to kill Collins outweighed any prejudicial effect. To counter Sexton's claim of an alternative perpetrator, the trial court properly allowed the Commonwealth to introduce firearm evidence refuting that claim. No abuse of discretion occurred.

### d. The trial court did not abuse its discretion in admitting testimony about messages Sexton sent alleging that Gibson committed the murder.

Next, Sexton argues that the trial court abused its discretion in allowing the Commonwealth to introduce the messages sent from Sexton without sufficient authentication. This claim is preserved.

KRE 901(a) requires authentication or identification as a condition precedent to the admissibility of evidence "to support a finding that the matter in question is what its proponent claims." An example of authenticating evidence includes the "[t]estimony of witness with knowledge. Testimony that a matter is what it is claimed to be." KRE 901(b)(1). To meet the preliminary

14

requirement of authentication, the offering party's burden "is slight" and requires only "a prima facie showing of authenticity." *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004). A witness with knowledge may authenticate evidence by testifying that the evidence is what it is claimed to be. *Baker v. Commonwealth*, 545 S.W.3d 267, 275 (Ky. 2018).

During trial, the Commonwealth introduced evidence, through Jernigan, that while on the run, she saw Sexton send Facebook messages from his "Jay Militia" account to his mother stating that Gibson was the murderer and asking her to relay that information to Detective Petrie. Sexton's mother testified that she received messages from Sexton's "Jay Militia" account informing her that Gibson was the real killer and to forward that information to police. Detective Petrie testified that he received copies of messages sent from Sexton to family members via a "Jay Militia" account, claiming that Gibson was the perpetrator. Jernigan further testified that she did not have access to Sexton's "Jay Militia" account and could not have sent messages from it. This testimony from witnesses with knowledge was sufficient to authenticate the messages to show that they were what the Commonwealth claimed them to be: messages sent from Sexton to his family to cast blame on another individual. Thus, the trial court did not abuse its discretion in permitting the Commonwealth to introduce them.

### e. No cumulative error resulted.

Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to

15

render the trial fundamentally unfair.   We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Here, no reversible error occurred.  Sexton has wholly failed to show that he received anything but a fair trial, and the evidence was sufficient for a jury to convict.  No cumulative error resulted.

### III.    Conclusion

For the foregoing reasons, the judgment and sentence of the Floyd Circuit Court is affirmed.

All sitting.  VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Nickell, JJ., concur.  Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Steven Jared Buck
Department of Public Advocacy

Timothy Alan Parker
Tim Parker Law


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Arnold Brent Turner
Assistant Attorney General