Billy Joe BARNES *v.* Anna M. BARNES

92-658 843 S.W.2d 835

Supreme Court of Arkansas
Opinion delivered December 14, 1992

*John Lloyd Johnson*, for appellant.

*Stephen R. Cobb*, for appellee.

DAVID NEWBERN, Justice. This is a paternity and child support case in which the Chancellor determined the appellant, Billy Joe Barnes, to be the natural father of Jordan Barnes and required him to pay $51 weekly child support and overdue support owed in the amount of $1,700. Barnes raises ten issues on appeal. We find no grounds for reversal and affirm the judgment.

Barnes was married to the child's mother, the appellee, Anna M. Barnes, now Anna Barnes Hicks, until they divorced in January of 1989. Two children were born during the marriage. Hicks testified that on December 24, 1989, Barnes returned from Oklahoma with their children who had been visiting their grandparents. Hicks stated Barnes stayed at her home that night so he could open presents with the children on Christmas morning. Hicks testified she and Barnes had sexual intercourse at approximately 2:00 a.m. Christmas morning. After the incident, Hicks realized she was pregnant, and the child was delivered on September 14, 1990, approximately nine months from the alleged date of conception. Hicks claimed Barnes was the child's father and stated he was the only man with whom she was sexually involved for a month and a half before and after she became pregnant.

Hicks admitted having sexual intercourse with two other men, Richard Piggott and Bob Smith, after she divorced Barnes. She testified she stopped seeing Piggott in September of 1989, and she used birth control the entire time they dated. Hicks stated she did not remember the exact dates when she had sexual intercourse with Smith. Smith later testified he had been sexually active with Hicks in 1990 and 1991. He testified, however, that he had had a vasectomy in June of 1984, implying he could not have been Jordan's father.

In January of 1991, Hicks filed a paternity suit in the Juvenile Division of Pulaski County Chancery Court, claiming Barnes was Jordan's father. The parties agreed prior to trial that a blood test would be administered to determine paternity. The agreement also provided the test would be admissible at trial. The test, which was later admitted over Barnes's objections, showed a 99.59% probability that he was the child's father. Based on the results of the blood test, coupled with Hicks's testimony regard-

ing access during the probably period of conception, the Chancellor determined Barnes·to be Jordan's natural father.

### 1. Subject matter jurisdiction

Barnes relies on Ark. Code Ann. § 9-10-101(a)(2) (Repl. 1991) and argues the Juvenile Division of Chancery Court was without subject matter jurisdiction, and the paternity case should have been transferred to Chancery Court. He contends the Pulaski County Chancery Court had exclusive jurisdiction over the case. Section 9-10-101(a)(2) states that a chancery court has exclusive jurisdiction of paternity matters arising during the pendency of original equity proceedings. The proper interpretation of this section of the statutes is that exclusive jurisdiction will lie in a chancery court when a paternity matter arises during the pendency of an action already within its jurisdiction. This provision is simply inapplicable to the facts of this case.

The more relevant provision is Ark. Code Ann. § 9-10-101(a)(1) (Repl. 1991) which provides that a chancery court exercises concurrent jurisdiction with the juvenile division of chancery court in paternity cases. Furthermore, Ark. Code Ann. § 16-13-304(b) (Supp. 1991) states, "Notwithstanding the provisions of the Arkansas Juvenile Code of 1989, or any other enactment which might be interpreted otherwise, the chancery court *or any division of chancery court* shall have jurisdiction for all cases and matters relating to paternity." (Emphasis added). The Juvenile Court is a division of Chancery Court, each exercising concurrent jurisdiction over paternity cases. Ark. Code Ann. § 16-13-602 (Supp. 1991); *Schuh* v. *Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990).

### 2. Transfer of paternity case

Barnes's second point relates to the transfer of his paternity case among several Chancery and Juvenile Court Judges in the Sixth Judicial District. Barnes argues the intra-district exchange violated our holding in *Lee* v. *McNeil*, 308 Ark. 114, 823 S.W.2d 837 (1992).

The case was originally filed in the Juvenile Division of Pulaski County Chancery Court with Chancellor Joyce Williams Warren presiding and set for trial on Friday, September 27,

1991. Because the Juvenile Judges had a backlog of pending paternity cases, the other Sixth District Chancellors were assisting them in deciding these cases. Although the cases were technically not reassigned, the Chancellors assisted the Juvenile Judges by hearing their cases on Fridays on a rotation basis. The Barnes case was originally scheduled to be heard by one of the six rotating Chancellors, but due to scheduling conflicts, the case was sent back to Chancellor Warren's Court where it had been filed originally.

In the *Lee* case, three judges in the Twentieth District entered into an exchange agreement which created within the District three divisions each of chancery, circuit, and juvenile courts. The practical effect of the agreement was that a criminal case could be heard by a duly elected chancery judge. In granting a writ of mandamus to prohibit this action, we held Ark. Code Ann. § 16-14-403 (1987), which addresses the exchange of districts among circuit and chancery judges within a district. The exchange contemplated by the statute was inter-district, as opposed to intra-district.

We recognize that the exchange of paternity cases among the Sixth District Juvenile and Chancery Courts was intra-district in nature. The exchange was, however, expressly authorized by statute. Arkansas Code Ann. § 16-13-1403(b)(2) (Supp. 1991) provides:

> The circuit judges and chancery judges subject to this subsection [Sixth District] may by agreement, hold either of the circuit or chancery courts and may hear and try matters pending in any of those courts or may hear or try matters in the same court at the same time. The judges subject to this subsection may adopt such rules as they deem appropriate for the assignment of cases in the circuit and chancery courts of their district.

We therefore find the *Lee* case distinguishable. There is a substantial difference between an agreement which allows a chancellor to preside over a criminal case and an agreement which allows a chancellor to preside over a paternity case which is clearly within the jurisdiction of a chancery court.

### 3. Separation of powers

Barnes contends the General Assembly violated the separation of powers doctrine, Ark. Const. art, 4, § 2, by enacting Ark. Code Ann. § 9-10-108 (Supp. 1991) which governs the admissibility of blood tests in paternity cases. He relies on *State* v. *Sypult*, 304 Ark. 5, 800 S.W.2d 402 (1990), and *Ricarte* v. *State*, 290 Ark. 100, 717 S.W.2d 488 (1986), in arguing that Section 9-10-108 impermissibly conflicts with this Court's established Rules of Evidence. The Chancellor held Barnes essentially waived his right to raise this constitutional issue because he and his former attorney agreed that the blood test would be admissible. In response to this ruling, Barnes testified his former attorney had not informed him that the test would be admitted in evidence.

The record supports the Chancellor's conclusion that by agreeing that the test would be admissible, Barnes voluntarily abandoned the right to later argue the test was inadmissible because the statute under which it was performed was unconstitutional. *See generally* *Bethel* v. *Bethel*, 268 Ark. 409, 597 S.W.2d 576 (1980) (stating waiver is "the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall be forever deprived of its benefits"). The agreement which was signed by Barnes' counsel specifically stated the blood test would be admissible in evidence. It shows the test was requested by Barnes who signed a form authorizing the test to be administered.

Although Barnes testified he was not informed of the details and effect of the agreement, a client is bound by the actions of his attorney upon matters concerning which the attorney is employed or held out to be the spokesman of the client. *Liles* v. *Liles*, 289 Ark. 159, 711 S.W.2d 447 (1986). General rules of agency law apply to the attorney-client relationship. *McCullock* v. *Johnson*, 307 Ark. 9, 816 S.W.2d 886 (1991); *Peterson* v. *Worthen Bank & Trust*, 296 Ark. 201, 753 S.W.2d 278 (1988); *White & Black Rivers Bridge Co.* v. *Vaughan*, 183 Ark. 450, 36 S.W.2d 672 (1931).

### 4. Sufficiency of the evidence

Barnes argues in his fourth point that there was insufficient evidence to establish paternity. To support his argument, Barnes

cites testimony from other witnesses who indicated they had a sexual relationship with Hicks.

■ In a paternity proceeding brought against a living putative father, the mother's burden of proof is a mere preponderance of the evidence, as the proceeding is civil in nature. *McFadden* v. *Griffith*, 278 Ark. 460, 647 S.W.2d 432 (1983). The statute, Ark. Code Ann. § 9-10-108(c)(2)(B) (1987), in effect at the time this cause of action arose, provided:

> If the results of the paternity tests establish a ninety-five percent (95%) or more probability of inclusion that the defendant is the natural father of the child and after corroborating testimony of the mother in regard to access during the probable period of conception, such shall constitute a prima facie case of establishment of paternity and the burden of proof shall shift to the defendant to rebut such proof.

■ The blood test showing a 99.59% probability that Barnes was the natural father, coupled with Hicks's testimony regarding access during the probable period of conception, gave rise to a statutory presumption of paternity. Although Hicks admitted having sexual relationships with other men, the events she admitted did not occur during the probable period of conception. The Chancellor found insufficient evidence to rebut the presumption of paternity, and we cannot say this decision was clearly erroneous. Ark. R. Civ. P. 52(a) (1992).

### 5. Continuance

Barnes claims the Chancellor erred by failing to grant his motion for continuance based on four reasons. For purposes of simplicity, the issues relating to the continuance will be discussed under one heading.

Barnes argues a continuance should have been granted because opposing counsel failed to respond to several discovery requests. First, he alleges Hicks's counsel failed to provide a copy of the blood test which was later introduced in response to a direct question asked in interrogation. Hicks's counsel admitted that, through oversight, he had failed to attach the blood test to his responses, but he stated Barnes had previously been furnished a copy of the test. Barnes admitted receiving a copy of the paternity

test prior to trial.

 The Chancellor refused to continue the case, but allowed Barnes time to compare his copy of the blood test with the copy Hicks intended to introduce in evidence. After examining the blood test which was admitted, Barnes did not indicate how it was different from the copy which had been furnished to him. When a party cannot demonstrate how he was prejudiced by the denial of a continuance, we will not reverse. *Jones* v. *State*, 308 Ark. 555, 826 S.W.2d 233 (1992). Because Barnes was allowed to compare his furnished copy of the blood test with the test which was later introduced, and presumably the copies were identical, he cannot demonstrate sufficient prejudice from the Chancellor's failure to grant the continuance.

 The second argument is that the Chancellor erred by not granting a continuance because opposing counsel failed to list the names and addresses of the expert witnesses who would testify in response to discovery requests. This argument is meritless as no expert witnesses testified at trial. The paternity test conducted by Roche Biomedical Laboratories, which had been furnished to Barnes prior to trial, was introduced through the affidavit of Dr. Lloyd Osborne who supervised the test. Barnes and his counsel were aware of Dr. Osborne as his name appeared on the copy of the report which had been furnished to them. Dr. Osborne did not testify at the trial.

Barnes next contends a continuance should have been granted to allow him time to cross-examine the expert witness who actually performed the blood test. Barnes made the request to cross-examine the expert who lived out-of-state only six business days before trial. The Chancellor rules six days was not a reasonable period of time to have someone before the Court to testify from out-of-state, and Barnes's motion for continuance was denied.

The law regarding cross-examining expert witnesses who perform blood tests in paternity cases which was in effect at the time this cause of action arose provided:

> A written report of the test results by the duly qualified expert performing the test, or by a duly qualified expert under whose supervision and direction the test and analysis

have been performed, certified by an affidavit duly subscribed and sworn to him before a notary public, may be introduced in evidence in illegitimacy actions without calling the expert as a witness. If either party shall desire to question the expert certifying the results, the party shall have the expert subpoenaed within a reasonable time prior to trial. Ark. Code Ann. § 9-10-108(b)(2)(A) (1987).

 We cannot say the Chancellor was incorrect in finding that Barnes failed to request the expert witness's appearance within a reasonable time prior to trial. Although Barnes argues he did not know the expert's name who performed the test, the report clearly indicated the test was supervised by Dr. Osborne and also provided the address of Roche Biomedical Laboratories in North Carolina. In light of Barnes's failure to comply with Section 9-10-108(b)(2)(A), we cannot say the Chancellor abused her direction by failing to grant the continuance. It is the challenging party's responsibility to have the expert subpoenaed within a reasonable time prior to trial. One cannot complain if the inability to confront or cross-examine witnesses is brought about by one's own inattention to the code requirements. *Roe* v. *State*, 304 Ark. 673, 804 S.W.2d 708 (1991).

 Barnes's last argument under this heading is that the Chancellor erred by failing to grant a continuance to allow him to obtain Hicks's medical records from her obstetrician, Dr. Kemp Skokos. Barnes claims these records would conclusively prove he was not the father of the child. The Chancellor refused to grant the continuance because the subpoena duces tecum served on Dr. Skokos was not properly served. The first subpoena directing Dr. Skokos to appear at trial and bring Hicks's medical records was served by Barnes. Because Barnes was a party to the case, he could not properly serve the subpoena. Ark. R. Civ. P. 45(c) (1992). The second subpoena served on Dr. Skokos was served by Barnes's current wife the day of trial. This second subpoena was not served at least two days prior to trial, and therefore, service was untimely. Ark. R. Civ. P. 45(d) (1992). In these circumstances, we cannot say the Chancellor abused her discretion by failing to grant the continuance.

### 6. A.R.E. 903

Barnes argues the blood test should not have been admitted because Hicks presented no evidence regarding the authentication requirements in North Carolina, where the test was performed, as required by Ark. R. Evid. 903 (1992). Rule 903 provides, "The testimony of a subscribing witness is not necessary to authenticate a writing *unless* required by the laws of the jurisdiction whose laws govern the validity of the writing [emphasis supplied]." Barnes claims that, before an out-of-state writing is admitted, the proponent must offer proof regarding the authentication requirements in the originating state. He argues Rule 903 creates a condition precedent for admissibility of an out-of-state paternity test.

The Rule provides a subscribing witness's testimony · to authenticate a writing will be unnecessary *unless* required by the laws of the originating jurisdiction. The burden of showing that the laws of the originating state require testimony from a subscribing witness for proper authentication lies with the party challenging the document. Barnes has not shown that North Carolina law requires a subscribing witness's testimony. We also note that as the paternity test was required to be notarized under 9-10-108(b)(2)(A), it was a self-authenticating document. Ark. R. Evid. 902(8) (1992). Hicks was not required to produce any extrinsic evidence of authenticity as a condition precedent to admissibility. *See Monark Boat Co.* v. *Fischer*, 292 Ark. 544, 732 S.W.2d 123 (1987).

### 7. Notice

Barnes alleges the Chancellor erred in finding the Attorney General was not timely notified that a constitutional question would be raised in the proceedings as required by Ark. Code Ann. § 16-111-106(b) (1987). Barnes had failed to offer any citation of authority or any convincing argument supporting this point, and we will not consider it on appeal. *Dixon* v. *State*, 260 Ark. 857, 545 S.W.2d 606 (1977).

### 8. Telephone bill

The eighth issue relates to the Chancellor's refusal to allow Barnes's telephone bill to be admitted under Ark. R. Evid.

803(24) (1992). The telephone bill would allegedly show that Barnes made a phone call to his fiance from his home at approximately 10:00 p.m. on Christmas Eve. Barnes argued this evidence would contradict Hicks's testimony that he was at her home at the time she alleged. As Barnes could not offer a sufficient foundation to establish the telephone bill as a business record under Ark. R. Evid. 803(6) (1992), he argued it should be admitted under the catch-all exception found in Ark. R. Evid. 803(24) (1992).

The Chancellor ruled the telephone bill should be admitted, if at all, under the business records exception to the hearsay rule and refused to allow its submission under 803(24).

We have recognized that the common-law exceptions to the hearsay rule are based either upon necessity or upon some compelling reason for attaching more than average credibility to hearsay. Any new exception, such as 803(24), must have circumstantial guarantees of trustworthiness equivalent to those supporting the common-law exceptions. *Hill* v. *Brown*, 283 Ark. 185, 672 S.W.2d 330 (1984). In determining trustworthiness under the residual hearsay exception in 803(24), the Chancellor must determine that (1) the statement is offered as evidence of a material fact, (2) the statement is more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts, and (3) the general purposes of the rules and the interests of justice will best be served by admission of the statements into evidence. *Blaylock* v. *Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987). The residual hearsay exception was intended to be used very rarely, and only in exceptional circumstances. *Ward* v. *State*, 298 Ark. 448, 770 S.W.2d 109 (1989).

Barnes failed to offer any evidence that the telephone bill had "circumstantial guarantees of trustworthiness" as required for admissibility under Rule 803(24). In these circumstances, we cannot say the Chancellor abused her discretion by refusing to allow the bill to be admitted under the residual hearsay exception. Barnes also failed to comply with Rule 803(24) by not notifying Hicks that the bill would be introduced under the Rule. A statement may not be introduced under 803(24) unless the proponent of it makes known to the adverse

party sufficiently in advance to provide the adverse party with a fair opportunity to prepare to meet it.

## 9. Child support amount

Barnes argues the Chancellor erred in setting the support amount at $51 per week. The Chancellor was presented with evidence that Barnes earned $300 per week, and that he was required by court order to pay $88 in child support for his two children born during his marriage to Hicks. The Chancellor subtracted the $88 support amount from income to arrive at a weekly take home pay of $212. She then applied the child support chart amount for one dependent and awarded $51 in support for Jordan. Barnes argues that instead of applying the chart amount required for one dependent, the Chancellor should have set support based on three dependents. By applying the chart in this manner, Barnes would only be required to pay $110 per week in support, whereas he is now required to pay $139 per week.

The child support chart should be applied to the child who is before the court. The result of applying the chart as Barnes suggests would be that the amount of support for the one child before the court is diluted. The chart is structured so that the amount of support per child decreases in proportion to the number of added dependents. *See Waldon* v. *Waldon*, 34 Ark. App. 118, 806 S.W.2d 387 (1991).

In adopting the chart, we specifically provided that weekly pay would be determined after deduction for "Presently paid support for other dependents by Court order." *In re: Child support Enforcement Guidelines*, 301 Ark. 627, 784 S.W.2d 589 (1990). We find no abuse of discretion.

## 10. Retroactive support

Barnes's final point is that the Chancellor incorrectly awarded past due child support in the amount of $1700. The Chancellor determined this amount by multiplying the minimum support amount which can be awarded under the chart ($25) by 68 weeks (the period from the child's date of birth to the date of judgment). Barnes argues this award was erroneous because there was not testimony presented on the needs of the child or his ability to pay.

In making the decision regarding retroactive support, the Chancellor recognized there was no evidence regarding Barnes's weekly take home pay during the relevant time period. Therefore, the Chancellor simply set the support at the minimum level required of an unemployed person. We find no error or abuse of discretion.

Affirmed.