Cite as 2024 Ark. App. 481

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV-24-187

|  |  |
|---|---|
| | Opinion Delivered October 9, 2024 |
| THERESA LANG<br><br>APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FJV-23-308] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE LEIGH ZUERKER, JUDGE |
| | AFFIRMED |

## BART F. VIRDEN, Judge

The Sebastian County Circuit Court adjudicated appellant Theresa Lang's granddaughter, a minor child (MC), dependent-neglected due to Lang's neglect. Lang argues that the trial court abused its discretion by allowing inadmissible hearsay into evidence. She also argues that the trial court erred in adjudicating MC dependent-neglected and in finding that she was the offender. We affirm.

### I. *Background*

On July 17, 2023, the Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect and emergency custody with respect to MC, born in March 2018, after placing a hold on her on July 13. In an affidavit attached to the petition, a family-service worker (FSW) attested that custody of MC was removed from Lang, who is MC's paternal

grandmother and has been her legal guardian since August 2020.[1] The FSW further attested that he had been contacted by an investigator at the Arkansas State Police Crimes Against Children Division (CACD) after semen was detected in MC's urine at Mercy Hospital. The petition further provided that MC had been taken to the Hamilton Child Advocacy Center (CAC) after she was discharged from the hospital. During a forensic interview, MC disclosed that someone had touched her vagina with his penis, but MC indicated by pointing to herself that she had done the touching. The petition provided that MC also said that she felt safe living at home with Lang and did not fear anyone in the home, which included her step-grandfather, Christopher Lang, and her uncle, Michael Lindsey. MC's clothing and urine sample were sent to the Arkansas State Crime Laboratory (crime lab) for further testing. The FSW set forth an extensive history with Lang's family dating back to 1997, which included allegations of abuse and neglect with respect to Lang's sons, Jonathan and Michael.

A second affidavit was attached to the petition in which CACD investigator Carley Zirbel attested that MC had indicated during her interview through anatomical drawings that a penis had hurt her vagina but that she had pointed to herself when asked who had hurt her. Zirbel noted that MC, who was developmentally delayed, was "not very verbal" and was "hard to understand." Zirbel attested that during a second interview, MC had made statements alternately implicating her step-grandfather and then her uncle, but she also said

---

[1]The FSW attested that MC had not seen her biological mother, Heather Lindsey, since 2020 and had not seen her biological father, Jonathan Lindsey, since 2022.

that she felt safe with them. Zirbel summarized MC's interview by stating that MC had not identified an alleged offender. DHS nevertheless placed a seventy-two-hour hold on MC.

On July 17, the trial court issued an ex parte order for emergency custody of MC and later found probable cause for issuance of the order. An adjudication hearing on August 31 was continued at DHS's request in order to obtain DNA test results. At an adjudication hearing held on October 10, DHS sought to withdraw its petition for dependency-neglect, saying that it would be proceeding "more or less, on innuendo" but noting that there was an ongoing investigation and that the police were not dropping the matter. DHS called Detective Donald Kolb of the Fort Smith Police Department (FSPD) to the stand. He described MC as "underdeveloped" and "nonverbal" and asserted that she had not disclosed any abuse during her interview at the CAC. Detective Kolb testified that the lab results revealed male DNA on several items that had been submitted but that Christopher and Michael had been excluded as contributors as to one sample that was tested. He said, however, that the police were investigating other leads inside Lang's home. Detective Kolb also testified that Lang had expressed concern with employees at Bost where MC attended school and that Lang had said that, several months prior, MC had suddenly stopped wanting to ride the school bus. The trial court then continued the hearing at the attorney ad litem's request without ruling on DHS's motion to withdraw its petition.

At the November 3 hearing, DHS elected to proceed with adjudication. Robert Still, an investigative caseworker with DHS, testified that MC was "kind of nonverbal" and that she "says a few words" but "doesn't form complete sentences." Still said that DHS had placed

3

a hold on MC on July 13 because of the "unknowns" in that DHS was awaiting DNA test results and that MC was living in a home with males "having a history as victims."[2] He also mentioned two male employees at Bost and said that none of the "suspects" had been ruled out. Still said that a hold had been placed on MC at the urging and insistence of the FSPD and at the instruction of his DHS supervisor.

Detective Kolb, who had testified at the October hearing, stated that, with respect to the tape lifts from MC's underwear, the lab could exclude Christopher and Michael as contributors. Detective Kolb said that the lab also examined internal vaginal swabs from the rape kit and found male DNA but concluded that there was not enough DNA to get a profile; thus, no male could be excluded.[3] Detective Kolb said that in his experience, the only reason for male DNA to be present on the vaginal swab of a young child is sexual intercourse. He further testified that the lab had found that the urine sample taken at the hospital was actually negative for semen and that it was, instead, an infection that mimics semen. He learned through Bost that MC's male therapist had seen her four out of the seven days leading up to the incident on July 13 but did not see her on July 13. Detective Kolb said that he also identified the bus driver who, according to Lang, had made MC uncomfortable but

---

[2]While this is true of Michael, there is no indication in the record that Christopher has any history as a victim of abuse.

[3]The reports introduced into evidence indicate that the lab tested various items, including internal vaginal swabs, inner and outer tape lifts from MC's underwear, and cuttings from MC's underwear. Christopher and Michael were excluded as DNA contributors from the *outer* tape lifts from MC's underwear.

noted that MC had not been on the bus in several months. Detective Kolb testified that he had collected DNA from the therapist and the bus driver a week and a half before the hearing and was still awaiting the test results. Later, Detective Kolb was recalled to the stand and said that at the CAC, he had told Lang that MC could leave with her that evening if she took her somewhere to stay other than home or that MC could go home with her if she could arrange for Christopher and Michael to stay elsewhere. He said that Lang told him she could not do that.

Lang testified that she works Monday through Friday from 10:00 or 11:00 a.m. to 2:00 p.m.; that she drives MC to school five days a week; that they arrive between 7:30 and 8:00 a.m.; and that she picks up MC when she gets off of work. Lang stated that MC goes to Bost school because she has a learning disability in that she has difficulty communicating. Lang was asked about the daily work schedules for Christopher and Michael, and she said that they both receive disability and that they are in the home "all day every day." She said that she is usually with MC in the home. Lang said that MC's bedroom is next to hers and that MC sleeps alone; that she and her husband, Christopher, sleep in the same bed; and that Michael's bedroom is at the back of the house. Lang testified that there is a possibility that Michael could have gained access to MC's room at night because her bedroom door is left open but that she (Lang) is a light sleeper and that MC has toys all over the floor.

Lang testified that on the morning of July 13, MC was "happy and playful, singing" and that she had cleaned MC with a wipe or washcloth and put a clean pair of underwear on her. She said that Bost administrators contacted her at work around 11:30 a.m. or noon

5

to pick up MC because her side was hurting and she had a fever of 100.4 degrees, so Lang took MC to the emergency room at Mercy Hospital on her doctor's advice. When she was told that there was semen in MC's urine, Lang thought that something must have happened at school. Lang initially testified that there was only one day that she could think of that she had left MC with Christopher and Michael and that was on July 4. Later, on cross-examination, she testified that prior to July 13, she had left MC with Christopher and Michael for a couple of hours on the Tuesday before July 13 and then for probably an hour on July 4. Lang said that Michael is twenty-eight years old. When asked about Michael's interaction with MC, Lang stated that they play together like a normal uncle and niece. She testified that she has never suspected that MC was being sexually abused. Lang denied that Michael had ever acted out sexually in her home but conceded that, when he was a teenager, the FBI had investigated allegations of sexual exploitation of both Michael and Jonathan by her ex-husband—their stepfather—who is now serving life in prison. She described Michael as having special needs but said that both of her sons have speech problems and are "kind of slow."

Melinda Smith, MC's foster parent, testified that MC was very shy and standoffish at first but that she had begun to "talk, very open about things, lately." Smith said that MC will sometimes speak only a word or two but will occasionally say a complete sentence. She described MC's overall communication as a "broken language." She said that on October 24, the family was doing their evening routine getting ready for bed and that she was dealing with another foster child when she typically would read to MC. She said that her husband,

Chris, offered to begin reading to MC. Smith testified that MC cried uncontrollably when Chris went into MC's room without her. Smith said that Chris described MC as "bawling her eyes out" and that she had asked MC what was wrong, to which MC replied that she was scared. Following a hearsay objection, which will be discussed below, the trial court admitted the hearsay pursuant to an exception. Smith continued her testimony, saying that MC had pointed to the window and said that she was scared of monsters. When Smith told her that there were no monsters there, MC said "okay," but she continued to cry and then said "uncle." Smith asked her what she was talking about, and MC repeated the word and said, "Uncle, touch pee-pee." Smith asked her, "Uncle who?" After saying "uncle" a few times, MC said, "Michael." Smith said that she assured MC that she was safe with her and Chris and that no one in that house had touched her. Smith testified that she did not know MC's family and did not know that there was an Uncle Michael.

Smith further testified that the subject was broached again on the morning of Halloween when the family was in their costumes on the way to the bus stop. Without objection, Smith said that MC "out of the blue" said, "Uncle Michael touched my pee-pee." Smith testified that she had been made aware that there were sexual-abuse allegations when taking MC as a foster child but that she had not been told about an uncle. She also said that she had been a foster parent for years and that she knew that "something had probably happened" because MC "holds her crotch a lot" and that "that's one of the things you recognize." In rebuttal, Lang testified that MC does not call Michael "Uncle" or even "Michael"—that she calls him "Shags" because he has long hair and looks like the character

7

"Shaggy" from the cartoon "Scooby-Doo." She also said that MC held her crotch only when she needed to urinate.

Jonathan, MC's father, testified that he knows Lang was not being truthful when she said that she does not leave MC alone with Christopher and Michael because Lang has told him that MC is with them when he calls to speak with her (MC) and is not permitted to do so because they are too busy. Jonathan also said that Lang has told him that, since "grandma" had died, Lang had left MC with Christopher and Michael when she worked in Oklahoma. Jonathan stated that, when he last saw MC on Christmas 2022, he had asked to take MC "because something didn't seem right," and he had thought MC "wasn't safe because she started showing signs to me and just kept asking me, to come home with me." Jonathan testified that he had been sexually abused by his stepfather in the home where he lived with Lang.

In rebuttal, Lang testified that Jonathan's testimony about her leaving MC with others while she was at work was not in reference to anything recent and that, although she did leave MC with her mother-in-law, her mother-in-law had died in August 2022. Lang admitted that her children had been abused in her home by her then husband and by people who had come into her home and sexually abused her sons on multiple occasions. Lang said that she was unaware of what was happening to her sons at the time but conceded that they had told her that their stepfather was abusing them but said that "when I'm fixing to take care of it, they come up, back up to me and tell me they lied."

The trial court adjudicated MC dependent-neglected due to Lang's failure to protect her and made a finding that MC's biological parents were not the offending parties. The trial court also remarked that it was concerned about returning MC to Lang's home given that Lang had declined an offer to have MC with her because she could not keep MC from Christopher and Michael.

## II. *Discussion*

## A. Residual Hearsay Exception

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c). Hearsay testimony is generally inadmissible; however, there are exceptions to the rule against hearsay. Ark. R. Evid. 802. Rule 803(24) provides as an exception a statement not specifically covered by any of the foregoing exceptions in the rule but having equivalent circumstantial guarantees of trustworthiness if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. The residual hearsay exception was intended to be used very rarely and only in exceptional circumstances. *Barnes v. Barnes*, 311 Ark. 287, 843 S.W.2d 835 (1992).

The trial court permitted Smith to testify to MC's statement on October 24 pursuant to the hearsay exception in Rule 803(24). Matters pertaining to the admissibility of evidence

9

are left to the sound discretion of the trial court, and we will not reverse such a ruling absent an abuse of that discretion. *Lynch v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 149. Abuse of discretion is a high threshold that does not simply require error in the trial court's decision but requires that the trial court act improvidently, thoughtlessly, or without due consideration. *Id.* Furthermore, we will not reverse absent a showing of prejudice, as prejudice is not presumed. *Id.*

Lang argues that MC's statement to Smith is not more probative than what MC said immediately after the July 13 hospital visit and points out that, while we have exceptions for present-sense impression and excited utterances, we do not have exceptions for delayed impressions and utterances. Also, Lang argues that DHS could have simply called MC as a witness. Further, Lang argues that the interests of justice are not served by allowing the hearsay because, considering that all of the witnesses testified to MC's inability to communicate and her difficulties with speaking, "myself" could sound like "Michael," especially if a child is "bawling" at the time it is said.

Even if we were to conclude that the trial court abused its discretion in admitting the hearsay, we hold that Lang cannot demonstrate prejudice given that Lang did not specifically object to MC's *second* hearsay statement testified to by Smith—the one made a week later on the morning of Halloween when MC, who was not crying at the time, blurted out in a complete sentence, "Uncle Michael touched my pee-pee." When there is no contemporaneous objection, an issue is not preserved for appeal. *Mills v. State*, 321 Ark. 621, 906 S.W.2d 674 (1995). Evidence that is merely cumulative or repetitious of other evidence

10

admitted without objection cannot be claimed to be prejudicial. *Burns v. State*, 2024 Ark. App. 329, 690 S.W.3d 133.

B. Sufficiency of the Evidence

Adjudication hearings are held to determine whether the allegations in a dependency-neglect petition are sustained by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2023). The petitioner bears the burden of proof by a preponderance of the evidence in dependency-neglect cases. Ark. Code Ann. § 9-27-325(h)(2)(A)(ii) (Supp. 2023). The standard of review on appeal is de novo, but we do not reverse the trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Hambrick v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 458, 503 S.W.3d 134. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* We give a high degree of deference to the superior position of the trial court to judge the credibility of the witnesses. *Id.*

Although the trial court's oral ruling referred only to Lang's failure to protect MC, the written order specifically found MC dependent-neglected on "the basis of neglect, consisting of failure to protect her from [the] substantial risk of serious harm or to prevent abuse or sexual abuse." "Dependent-neglected juvenile" means any juvenile who is at substantial risk of serious harm as a result of, among other things, neglect. Ark. Code Ann. § 9-27-303(17)(A)(v) (Supp. 2023). "Neglect" includes acts or omissions of a guardian that constitute the failure to take reasonable action to protect the juvenile from abuse or sexual

11

abuse when the existence of this condition was known or should have been known. Ark. Code Ann. § 9-27-303(37)(A)(iii).

As a preliminary matter, there was some evidence that MC had been sexually abused. On July 13, she disclosed sexual abuse without naming an offender during a forensic interview. Although the urine test at the hospital yielded a false positive for semen, the crime lab discovered male DNA on MC's internal vaginal swabs from a rape kit. Moreover, Smith testified that on October 31, MC said, "Uncle Michael touched my pee-pee." Although it was hearsay, this evidence was admitted without objection and may be considered substantive evidence. *Libokmeto v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 274, 577 S.W.3d 35.

On appeal, Lang argues that there was no evidence that she knew or should have known that MC was being sexually abused. She points out that, at the time of the November adjudication hearing, one DNA test had excluded the men in her household. Although another DNA test could not rule out any man anywhere, the police had only just begun to investigate men at MC's school and were still awaiting those results. Citing *Madore v. Arkansas Department of Human Services*, 2017 Ark. App. 296, 521 S.W.3d 172, Lang contends that there is no evidence that she failed to take reasonable steps to protect MC or that she knew or should have known of any sexual abuse. In *Madore*, we reversed a dependency-neglect adjudication because there was insufficient evidence that a mother had failed to supervise her children, resulting in their being left alone. The trial court in that case had selected a very specific finding of neglect in the juvenile code that required a finding that a child had

12

been left alone; however, the trial court made no such finding. Indeed, there was no evidence in the *Madore* record that supported that finding. We do not agree with Lang's assertion that *Madore* is "dispositive."

In the absence of a showing to the contrary, we ordinarily presume that a court acted properly and made the findings necessary to support its judgment. *Younger v. Ark. Dep't of Human Servs.*, 2022 Ark. App. 138, 643 S.W.3d 487. There are recognized limitations on the use of this presumption, which were set out in *First National Bank of Lawrence County v. Higginbotham Funeral Service, Inc.*, 36 Ark. App. 65, 818 S.W.2d 583 (1991) (Cracraft, J., dissenting) (citing 5 C.J.S. *Appeal and Error* § 1564(8) (1958)). For example, a finding will not be implied where it would be clearly wrong to do so, as where it would be in contradiction of the record, and the doctrine of implied findings will not be applied where the fact is not fairly inferable from the facts found. *Id.* at 74–75, 818 S.W.2d at 588.

In adjudicating MC dependent-neglected, the trial court clearly considered Lang's "substantial history" with DHS dating back to 1997, which included a true finding of neglect in 2009 for Lang's failure to protect Jonathan and Michael from sexual abuse when they were minors. Lang testified that her sons were sexually abused in her home by her now ex-husband as well as by random people who came into the home for that purpose. Here, the trial court was not required to believe Lang's claims set forth in Still's and Zirbel's affidavits that she rarely left MC with Christopher or Michael; that she never left MC with only one of the men in the home; and that no one ever visits the home. In addition, the trial court was astounded by Detective Kolb's testimony that Lang had declined to take MC home with

13

her after her interview at the CAC—an option that would have kept her out of DHS custody—because Lang could not keep MC away from Christopher and Michael. Moreover, Jonathan, who was a victim of Lang's failure to protect from sexual abuse in her home, spoke of MC's safety and his pleas to remove her from Lang's home. The trial court was entitled to believe Jonathan's testimony that "something didn't seem right" and that MC "started showing signs to [him]" that she was not safe in Lang's home because she kept asking to go home with him. The trial court could reasonably conclude that, if Jonathan recognized or sensed that MC was not safe in the home, then Lang—who spent considerably more time with MC and who should have been hypervigilant with respect to signs of sexual abuse given her past failure to protect her sons—should have known that MC was being sexually abused. Under these circumstances, we cannot say that the trial court's adjudication of MC as dependent-neglected is clearly against the preponderance of the evidence.

Lang also argues that she should not have been named the offender because there was no evidence that any serious harm, abuse, or sexual abuse occurred when she was around or that it occurred in her home. She cites *Young v. Arkansas Department of Human Services*, 2018 Ark. App. 270, 549 S.W.3d 383, and asserts that she had no reason to know about any abuse. Lang contends that the trial court, in ruling from the bench, did not find that she was the offender and that the finding simply made its way into the order that DHS drafted. In *Young*, we reversed in part a dependency-neglect adjudication as it pertained to the mother. In that case, the trial court's written order conflicted with its earlier oral findings. While the written order generally controls, *Anderson v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 401, 608

S.W.3d 915, there was no evidence in the record to support the written findings. We do not have a similar conflict here.

In our de novo review of the record, there is evidence to support the trial court's finding that Lang, as MC's guardian, is the offender for failing to protect MC and failing to prevent her from being sexually abused. *See Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). There is some evidence that MC was sexually abused, and some indication that it was perpetrated by someone in Lang's home. Moreover, the trial court was entitled to disbelieve Lang's testimony about how inseparable she and MC were while in the home. We cannot say that the trial court clearly erred in finding that Lang is the offender.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.